# In the United States Court of Federal Claims

Nos. 26-1126C & 26-1190C
Filed: November 16, 2026
FOR PUBLICATION*

**TETRA TECH, INC.,**

***Plaintiff,***

**VGS INFRASTRUCTURE SERVICES INC.,**

***Consolidated Plaintiff,***

**v.**

**UNITED STATES,**

***Defendant,***

**and**

**POND CONSTRUCTORS, INC.,**

***Defendant-Intervenor.***

*Holly Anne Roth, John M. McAdams III, Tanner N. Slaughter, Ben R. Smith, Richard Ariel,* and *Emmalyn McCarthy*, Holland & Knight, Tysons, VA, for Tetra Tech.

*Aron Caraway Beezley, Nathaniel J. Greeson,* and *Gabrielle A. Sprio*, Bradley Arant Boult Cummings LLP, Washington, DC, for VGS Infrastructure Services.

*Samuel Joseph Harrison*, Civil Division, U.S. Department of Justice, Washington, DC, for the defendant.

*Damien Clemens Specht, Brian Edward Doll, Jr., James Andrew Tucker,* and *Jillian I. Stern*, Morrison & Foerster LLP, Washington, DC, for Pond.

* Pursuant to the protective order in this case, this opinion was filed under seal on November 4, 2026, and the parties were directed to propose redactions of confidential or proprietary information by November 13, 2026. The parties proposed redactions, which are all accepted, are denoted by [* * *].

## MEMORANDUM OPINION

***HERTLING*, Judge**

In this post-award bid protest, Tetra Tech, Inc. ("Tetra Tech") and VGS Infrastructure Services, Inc. ("VGS") challenge the award by the defendant, acting through the Army Corps of Engineers ("Corps"), to defendant-intervenor Pond Constructors, Inc. ("Pond") of solicitation No. W912DY26RA004 (the "solicitation") for preventative and corrective maintenance ("PMCM") services in support of the Defense Logistics Agency's ("DLA") fuels program. The contract is a firm-fixed price contract with a one-year base period, two one-year options, and one half-year option.

Both plaintiffs allege that the Corps erred in evaluating Pond's technical and management approach because Pond failed to complete sample service order forms properly and in finding that failure to be only a weakness rather than a disqualifying deficiency.

Tetra Tech also alleges that the Corps arbitrarily evaluated Pond's and its own technical and management approaches, past performance, and small-business participation. In addition, Tetra Tech alleges that the Corps failed to conduct an unbalanced pricing analysis. As a result of these errors, Tetra Tech alleges that the Corps irrationally identified Pond's offer as providing the best value.

VGS likewise alleges errors in the Corps' evaluation of Pond's and its own technical and management approaches, and that the Corps acted arbitrarily when evaluating price by failing to remove an unsuccessful bidder's incomplete pricing data from its analysis. VGS alleges that this failure to remove incomplete data caused the Corps to miss Pond's unbalanced pricing and not conduct the required unbalanced-pricing analysis. Finally, VGS alleges that the Corps irrationally identified Pond's offer as the one providing the best value to the government.

The Corps' evaluation of the offerors' proposals was neither arbitrary nor capricious. With respect to the evaluations of the offerors' technical and management approaches, the Corps reasonably assigned or declined to assign strengths, deficiencies, or weaknesses and properly explained its decisions. The Corps did not engage in disparate treatment by assigning Pond, but not Tetra Tech, a strength for its safety program. The Corps' evaluation of the offerors' past performance was likewise reasonable. Finally, the Corps reasonably evaluated Tetra Tech's small business participation and conducted an appropriate price evaluation.

None of the protesters' challenges establishes that the Corps' evaluation was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. As a result, the plaintiffs' motions for judgment on the administrative record are denied, and the defendant's and defendant-intervenor's cross-motions for judgment on the administrative record are granted.

## I. FACTUAL BACKGROUND

### A. Request for Proposals

On March 16, 2026, the Corps issued a solicitation to procure PMCM services in support of DLA and the Air Force within the North Atlantic Division – Air Force ("NAD-AF"). (AR Tab

20a at 2818; AR Tab 24a at 3529.) The procurement was conducted under the auspices of the Corps' "Fuels Program" managed at its engineering and support center in Huntsville, Alabama. (AR Tab 16 at 1828.) The Fuels Program "is a comprehensive maintenance program that provides vital preventive maintenance and corrective services to the United States Government to sustain a worldwide robust fueling capability in support of federal petroleum facilities and petroleum systems." (AR Tab 20a at 2821.)

The awardee is to provide preventative maintenance ("PM") and corrective maintenance ("CM") to petroleum systems at various facilities. PM is "recurring, periodic, or scheduled work to preserve a system or facility by preventing its deterioration, prevent component failure, prevent unscheduled outages, and identify components requiring replacement or repair." (*Id.* at 2822.) Corrective maintenance refers to the "restoration of a real property to such a condition that it may effectively be utilized for its designated purpose by overhaul, re-processing or replacement of constituent parts or materials that have deteriorated by action or elements or usage and that have not been corrected through maintenance." (*Id.*) PM is predictable, being performed quarterly, semi-annually, or annually, whereas CM is less predictable, being performed as needed.

The solicitation contemplated the award of a single firm-fixed price contract with a three-and-a-half-year period of performance, including a one-year base period, two one-year options, and one half-year option. (AR Tab 16 at 1828.) Offerors had to have experience in "repair, maintenance, and operation of federal petroleum facilities and petroleum systems ensuring those systems are in compliance with codes, criteria, regulations, and laws of the United States[.]" (*Id.*)

The Corps issued two modifications to the solicitation on March 16, 2026. (AR Tab 20; AR Tab 21.) As amended, the solicitation established that the award would be made in accordance with Revolutionary FAR Overhaul ("RFO") 15.103-1 to the responsible offeror whose proposal represented the best value to the government. (AR Tab 20c at 3109.) Proposals would be evaluated under the following factors: (1) Technical and Management Approach; (2) Past Performance; (3) Small Business Participation; and (4) Price. (*Id.* at 3109-10.) "The non-price factors (Factors 1, 2, and 3) when combined are significantly more important than price (Factor 4)." (*Id.* at 3109.) To be considered for award, offerors had to receive at least an "Acceptable" rating for Factors 1 (Technical and Management Approach) and 3 (Small Business Participation), and at least a "Satisfactory Confidence" or "Neutral Confidence" rating for Factor 2 (Past Performance). (*Id.* at 3110.) Factor 4 (Price) was not rated but was evaluated for fairness and reasonableness. (*Id.*) The Corps reserved the right to award a contract to other than the lowest-priced offeror. (*Id.*)

**1. Technical and Management Approach**

The offerors' Technical and Management Approaches were to be evaluated for adequacy of response and feasibility of approach. (AR Tab 20c at 3111.) Under adequacy of response, the Corps would evaluate "whether the [o]fferor's methods and approach have adequately and completely considered, defined, and satisfied the requirements specified in the solicitation." (*Id.*) The evaluation would "determine the extent to which each requirement of the solicitation has been addressed in the proposal in accordance with the proposal submission section of the solicitation." (*Id.*) The Corps would evaluate various aspects of offerors' submissions including

approaches to quality management and control, meeting safety requirements, and developing and using maintenance repair teams. (*Id.*) Feasibility would assess "whether the [o]fferor's method and approach to meeting the solicitation requirements provide the Government with an acceptable level of confidence of successful completion within the required schedule." (*Id.*)

Technical and management approach submissions were also to include, among other submissions, information outlined in Attachment 0003, "Technical Evaluation Form – NAD-AF." (*Id.* at 3105.) Attachment 0003 is a technical evaluation form with general, yes/no questions to which offerors were to respond. (AR Tab 16c.) The technical evaluation form also includes short-answer questions regarding proposed staffing, staff utilization, safety, initial site-visit plans, facility-maintenance plans, PM, and records management, maintenance activities and team composition, CM, a sample service order form, service order metrics, and assumptions. (*Id.*)

For Attachment 0003, offerors were instructed to "describe [their] own technical capabilities and those specialized services or capabilities that will be provided by any team members." (AR Tab 20c at 3106.) Offerors were further instructed to "demonstrate clearly that [they] can self-perform or perform through [ ] teaming arrangements any of the required services covered under this contract." (*Id.*) Offerors had to have specific minimum qualifications, including five years of experience "on federal installations in maintenance and repair of petroleum fuel storage and distribution facilities." (AR Tab 20a at 2826.)

Part of the technical evaluation included the review of sample service orders for two defects described in Attachment 0003. Service orders are requests for the contractor to perform CM. In essence, service orders act as individual firm-fixed price agreements between the contractor and the Corps. Service orders are proposed and priced under the awarded contract on an as-needed basis as the work arises—akin to an Indefinite Delivery, Indefinite Quantity arrangement. (*See* Tab 20a at 2871.) When CM work is needed, a service order will be initiated, the contractor will provide a proposal using the service order form, and the parties will negotiate a final agreement as to price, process, and scope. (*Id.*)

The sample service orders were to include general and safety information, a description of the service orders, a breakdown of the costs associated with addressing each defect, and the items and labor required. (AR Tab 20b at 3100; AR Tab 7b.2.) These sample service orders would be evaluated for the offerors' ability to understand and perform service orders at a fair and reasonable price and "for completeness." (AR Tab 20c at 3111.)

At the end of the evaluation process, the Corps would assign strengths and weaknesses. (*Id.* at 3110.) "Strength" was defined in the solicitation as "an aspect of an offeror's proposal with merit or [that] will exceed specified performance or capability requirements to the advantage of the Government during contract performance." (*Id.*) "Weakness" was defined as "a flaw in the proposal that increases the risk of unsuccessful contract performance." (*Id.*) "Deficiency" was defined as "a material failure of a proposal to meet the Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." (*Id.* at 3110-11.) "Uncertainty" was defined as "any aspect of a non-cost/price factor proposal for which the intent of the offer is unclear." (*Id.* at 3111.)

The Corps was to weigh the relevant factors and assign each proposal an adjectival rating for Factor 1 as outlined in the following chart:

| Color Rating | Adjectival Rating | Description |
|---|---|---|
| Blue | Outstanding | Proposal demonstrates an exceptional approach and understanding of the requirements and contains multiple strengths and/or at least one significant strength, and risk of unsuccessful performance is low. |
| Purple | Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength or significant strength, and risk of unsuccessful performance is low to moderate. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Yellow | Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Red | Unacceptable | Proposal does not meet requirements of the solicitation and, thus, contains one or more deficiencies and is unawardable, and/or risk of performance is unacceptably high. |

(*Id*. at 3112.)

**2. Past Performance**

Offerors had to submit at least two and no more than five references consisting of Contractor Performance Assessment Reporting System ("CPARS") reports or Past Performance Questionnaires ("PPQs") "to demonstrate their ability to successfully perform the requirements of [the] solicitation." (*Id*. at 3106.) The Corps would evaluate each reference for relevance, recency, and quality to assess "the [o]fferor's likelihood of success in performing the solicitation's requirements and delivering high quality products and services." (*Id*. at 3112.) "Recency" is defined as projects that were started or completed within three years from the closing date of the Corps' solicitation. (*Id*. at 3106.) Projects that were started or completed within three years from the closing date of the solicitation would be considered, while those outside three years from the closing date of the solicitation "[would] not be considered in the evaluation." (*Id*. at 3113.) Projects would be considered "relevant" if "similar and logically connected to the context of [the Corps'] solicitation in terms of scope (dollar value, size, project type, contract type) and magnitude of effort and complexities as the work outlined in [the] solicitation." (*Id*. at 3106.) "More relevant past performance will be treated as a stronger predictor of future success and will therefore have more influence on the overall performance confidence assessment than past performance of lesser relevance." (*Id*. at 3113) Relevance would be rated either "Not Relevant," "Somewhat Relevant," "Relevant," or "Very Relevant," as defined in the following chart:

| PAST PERFORMANCE RELEVANCY | |
|---|---|
| **Rating** | **Description** |
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

(*Id*. at 3113.)

The Corps would evaluate "the overall quality of the past performance" based on CPARS ratings and PPQs and would assign a past performance confidence rating based on the recency and relevancy of an offeror's past performance and the quality of the offeror's CPARS ratings and PPQs, as outlined in the following chart:

| PAST PERFORMANCE CONFIDENCE ASSESSMENTS | |
|---|---|
| **Rating** | **Definition** |
| Substantial Confidence | Based on the Offeror's recent/relevant performance record, the Government has a high expectation that the Offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the Offeror's recent/relevant performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available, or the Offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the Offeror's recent/relevant performance record, the Government has a low expectation that the Offeror will successfully perform the required effort. |
| No Confidence | Based on the Offeror's recent/relevant performance record, the Government has no expectation that the Offeror will be able to successfully perform the required effort. |

(*Id.* at 3106, 3113-14.)

### 3. Small Business Participation

Offerors were to be evaluated "on the level of small business commitment demonstrated for the proposed acquisition and the use of small businesses demonstrated in the performance of prior contracts relevant to the [performance work statement ("PWS")]." (*Id.* at 3107.) Proposals were to identify small businesses to be used in performance, the extent of the commitment to use these small businesses, the complexity and variety of the work the small businesses were to perform, and past performance of the offeror in complying with small business requirements. (*Id.*) The solicitation set minimum quantifiable requirements ("MQRs") for six categories of small businesses: Small Business – 20 percent; Small Disadvantaged Business – 5 percent; Woman-Owned Small Business – 2.5 percent; Historically Underutilized Business Zone Small

Business – 3.0 percent; Veteran-Owned Small Business – 4.0 percent; and Service-Disabled Veteran-Owned Small Business – 3.0 percent. (*Id*. at 3107–08.) The Corps would evaluate and assign an adjectival rating to each offer based on the extent to which it met the MQRs, as reflected in the following chart:

| Color Rating | Adjectival Rating | Description |
| --- | --- | --- |
| Blue | Outstanding | Proposal indicates an exceptional approach and understanding of the small business objectives. |
| Purple | Good | Proposal indicates a thorough approach and understanding of the small business objectives. |
| Green | Acceptable | Proposal indicates an adequate approach and understanding of small business objectives. |
| Yellow | Marginal | Proposal has not demonstrated an adequate approach and understanding of the small business objectives. |
| Red | Unacceptable | Proposal does not meet small business objectives. |

(*Id*. 3115.)

### 4. Price

Offerors needed to complete a pricing worksheet, reflecting the total pricing for each Contract Line Item Number ("CLIN") and resulting in a firm-fixed price proposal. (*Id*. at 3108–09.) As part of their submission, offerors were also required to "provide a copy of the sample service order submission provided under Factor 1" and proposed labor rates for all direct labor categories. (*Id*.) Pricing was to be evaluated for fairness and reasonableness in accordance with RFO 15.404.[1] (*Id*. at 3116.) Pricing would not be rated but would be considered in the best value-tradeoff analysis. (*Id*. at 3115-16.)

The solicitation included six CLINs: Quarterly PM, Semi-Annual PM, Annual PM, Corrective Measures (Gov. Provided), Other Direct Cost, and Irregular Maintenance. Offerors were also to submit a narrative identifying the basis for their CLIN estimates. (*Id*. at 3108; AR Tab 20d.) The CLINs "[are] divided in two distinct services, [PM] and [CM]." (Tab 20a at 2821.) PM tasks to be performed are predictable and structured, leading to a firm-fixed price proposal. CM work, being unpredictable and need-based, was to be priced during contract performance through the service order process as specific CM tasks arise. Thus, offerors were instructed not to price CLIN 4, Corrective Measures, which used a Corps-provided value of $63,564,434.00. (AR Tab 20d.) The solicitation provided that this value was "provided by the

[1] The solicitation provides that pricing will be evaluated in accordance with the RFO. (AR Tab 20c at 3115.) The pricing analysis, however, refers to the FAR. (AR Tab 50 at 5310, 5313.) These provisions of the FAR did not change substantively when readopted and renumbered in the RFO. Thus, this opinion will refer to the RFO sections applicable to the Corps' pricing analysis.

Government as an estimate of [CM] to be performed" and "may increase or decrease depending on the needs that arise for unscheduled services." (*Id.*)

To provide a better estimate of their CM pricing, offerors were to submit binding service order markup percentages and sample service order forms for the Corps to evaluate. (*See* Tab 20d.) The service order markup percentages were to include "all prime contractor costs associated with the service order"; these costs would "apply to all service orders submitted under the awarded contract." (Tab 20a at 2883-84.) The sample service order forms included pricing information, such as the cost for labor, required parts, and hours needed to complete the service orders submitted as examples. Combining the information provided in the sample service orders with the labor rates and the service order markup percentages in the pricing worksheet resulted in each offeror's proposed price for completion of each of the two required sample service orders.

In accordance with RFO 15.404-1(b), the Corps would compare offerors' proposed pricing. To make this comparison, the Corps would use a standard deviation model, whereby it took the overall average of all offerors' total pricing and then calculated which offers were plus or minus one standard deviation from that average price. The same model was used to evaluate each of the offerors' pricing for individual CLIN, key personnel labor rates, CM service order markups, and the sample service orders from the technical evaluation. (AR Tab 50 at 5310-14.) The Corps also included a comparison of the proposed total prices with the independent government cost estimates ("IGE") under RFO 15.404-1(b)(5), using the same standard deviation model. (*Id.* at 5313.)

**B. Evaluations**

Five timely proposals were received. (AR Tabs 22, 23, 24, 25, 26.) A source selection evaluation board ("SSEB"), consisting of qualified staff assigned to specialized teams to evaluate each factor, was established. (AR Tab 50 at 5256-57.) Each proposal was evaluated, and the consensus ratings were finalized as attachments to the SSEB report. (Tab 50 at 5260-307.) The proposals received the following ratings:

| Table 4: List of Offerors and Evaluation Findings | | | | | | |
|---|---|---|---|---|---|---|
| **Offeror** | **Small Business (Y/N)** | **Joint Venture (Y/N)** | **FACTOR 1: TECHNICAL & MANAGEMENT APPROACH** | **FACTOR 2: PAST PERFORMANCE** | **FACTOR 3: SMALL BUSINESS PARTICIPATION** | **FACTOR 4: PRICE** |
| Pond Constructors, Inc | N | N | Good | Substantial Confidence | Outstanding | **$69,256,220.84** |
| Offeror D | Y | N | Unacceptable | Neutral Confidence | Outstanding | [* * *] |
| Tetra Tech | N | N | Good | Satisfactory Confidence | Good | [* * *] |
| VGS Infrastructure Services, Inc | N | N | Acceptable | Substantial Confidence | Outstanding | [* * *] |
| Offeror E | N | N | Acceptable | Substantial Confidence | Outstanding | [* * *] |

(*Id*. at 5258.)

### 1. Technical and Management Approach

#### a. Tetra Tech's Technical and Management Approach

Tetra Tech received a "[g]ood" rating for its technical and management approach. Its proposal was found to contain two strengths and no weaknesses, deficiencies, or uncertainties. Tetra Tech's [* * *]. The Corps concluded that Tetra Tech's ability to [* * *]. Tetra Tech's [* * *]. (AR Tab 50 at 5270-71.)

#### b. VGS's Technical and Management Approach

VGS received an "[a]cceptable" rating for its technical and management approach. It received one strength, one weakness, one uncertainty, and no deficiencies. VGS received a strength for including a dedicated project coordinator, a position not required by the PWS.

VGS received a weakness related to its Facility Maintenance Plan ("FMP"). (AR Tab 50 at 5272-73.) The awardee would have to update and maintain government-provided FMPs before conducting the ISVs for each site. (Tab 20a at 2824, 2850.) This requirement included a process of "cross walking" assets between real-property inventory, base-asset identifiers, real property unique identifiers ("RPUIDs"), and component unique identifiers ("CUIDs"). "Cross walking" refers to the process of aligning assets between different databases so that they are consistent and items, quantities, locations, and other details are correctly represented. If the contractor found variances in the government-provided FMPs, it was to note the variance directly in the FMPs. (AR Tab 16a at 2013.) The solicitation prescribed that the contractor would update the FMPs by "[a]nnotat[ing] variances in component additions or deletions using red font and for any deletions in equipment, use a strikethrough effect." (*Id.*) The FMPs were to be used throughout the life of the contract to track asset additions, upgrades, or removals.

VGS, however, proposed to use its own crosswalk table to [* * *]. (AR Tab 25b at 3941.) VGS proposed that it would compile a crosswalk table, which would be [* * *]. (*Id.*) VGS would provide this table as an [* * *] and proposed that [* * *]. (*Id.*)

VGS received a weakness for providing an "additive table/layer embedded into the FMP for [g]overnment review processing throughout the life of the contract." (AR 50 at 5273.) The Corps concluded that this approach reflected that VGS did not clearly understand the requirements of the PWS.

VGS received an uncertainty for failing to provide historical workplace injury and illness data with its technical and management approach. The solicitation required the submission of both injury and illness information and Total Recordable Incident Rate ("TRIR"), two separate data sets required by the Occupational Safety and Health Administration ("OSHA"). (AR Tab 16c at 2249.) VGS's proposal provided its "5 year TRIR" data and "Total 2025 TRIR" data to correspond with the two requirements. (AR Tab 25b at 3938.) The SSEB noted that it believed the first set of data was mislabeled as TRIR, when it should have been labeled injury and illness data, and assigned VGS an uncertainty. (AR Tab 50 at 5274.)

**c. Pond's Technical and Management Approach**

Pond received a "[g]ood" rating for its technical and management approach. Its proposal contained four strengths, one weakness, one uncertainty, and no deficiencies. Pond received a strength for its proposed contractor-developed safety program, which included a [* * *] program in addition to the safety training required in the solicitation. (AR Tab 50 at 5261.) The SSEB found that the additional [* * *], combined with a demonstrated "dedication to safety culture" over the prior five years, as evidenced through the OSHA data sets, would reduce the risk of unsuccessful performance. (*Id.* at 5262.)

Pond also received a strength for proposing a [* * *]. The SSEB determined that the breadth of technical backgrounds in the proposed staffing reflected a "thorough and thoughtful approach to staffing regarding the specific maintenance requirements of this contract" and "should reduce risk to the government of unsuccessful contract performance." (*Id.*)

Pond next received a strength for [* * *] to reduce [* * *]. The solicitation requires offerors to provide a timeline for its process for performing the ISVs. (AR Tab 20b at 3099.) Pond proposed [* * *]. (AR Tab 50 at 5262.) The SSEB determined that [* * *] should reduce the Corps' [* * *] and, in turn, reduce the risk of unsuccessful performance.

Pond's final strength was received for providing [* * *] and [* * *] for [* * *]. The SSEB determined that this proposed team should "reduce costs and [ ] risk to the Government of unsuccessful performance." (*Id.* at 5263.)

Pond received a weakness for incorrectly completing its two sample service order forms, which indicated Pond would use a subcontractor but failed to specify the costs associated with the use of that subcontractor. The SSEB determined that this error showed that Pond "does not clearly demonstrate an understanding of the requirements," leading to an "increase[d] risk" of "unsuccessful contract performance." (*Id.*)

Pond received one uncertainty for failing to provide an Experience Modification Rate ("EMR") for the most recent year. The EMR provided by Pond was not for the most recent year, and the SSEB was unsure about whether the EMR contained a typo or if Pond did not have an EMR for the most recent year. (*Id*. at 5263-64.)

### 2. Past Performance

#### a. Tetra Tech's Past Performance

Tetra Tech received a "[s]atisfactory [c]onfidence" rating for past performance. Tetra Tech submitted five projects. All five were found to be very relevant and recent, involving the same scope and magnitude of effort and complexities as this solicitation requires. Most of the ratings from these projects' CPARSs were "[s]atisfactory," but two of the ratings included in PPQs for the fifth project were "[m]arginal" for safety and security; no narrative in the PPQs explained the basis for these latter ratings. (*Id*. at 5283.)

#### b. VGS's Past Performance

VGS received a "[s]ubstantial [c]onfidence" rating for past performance. VGS submitted five projects that were all found to be recent and very relevant, involving the same scope and magnitude of effort and complexities as the solicitation requires. VGS received mostly satisfactory ratings on its CPARS, with four very good ratings. The SSEB concluded that because the five projects were recent and very relevant, VGS's satisfactory ratings were a strong predictor of future success, warranting a substantial confidence rating. (*Id*. at 5286-87.)

#### c. Pond's Past Performance

Pond received a "[s]ubstantial [c]onfidence" rating for its past performance. Pond submitted three projects that were all considered recent. Two of the projects were found to be very relevant, involving essentially the same scope and magnitude of effort and complexities as the solicitation requires. The third project was found to be merely relevant because the contract included work involving a different fuel system. The CPARS for the three projects consisted of exceptional, very good, or satisfactory ratings. (*Id*. at 5280.)

### 3. Small Business Participation

#### a. Tetra Tech's Small Business Participation

Tetra Tech received a "[g]ood" rating for its small business participation. The SSEB identified four strengths and no weaknesses, deficiencies, or uncertainties. The SSEB explained that Tetra Tech met or exceeded all socio-economic subcategory target percentages, specifically identified small businesses in its proposal, and identified the complexity and variety of work that the small businesses would perform. While the SSEB found that Tetra Tech met or exceeded all socio-economic subcategory targets, it only received strengths for the three categories for which its proposal exceeded the target percentage and one additional strength for the [* * *] letters of commitment it submitted. (*Id*. at 5299.)

**b. VGS's Small Business Participation**

VGS received an "[o]utstanding" rating for its small business participation. The SSEB identified six strengths and one uncertainty, but no weaknesses or deficiencies. The SSEB explained that VGS met or exceeded all socio-economic subcategory target percentages, specifically identified small businesses in its proposal, and identified the complexity and variety of work that the small businesses would perform. VGS received six strengths for exceeding the target percentage of each of the socio-economic categories, and one uncertainty for not including its six letters of commitment from the small businesses identified in its proposal. (*Id.* at 5302.)

**c. Pond's Small Business Participation**

Pond received an "[o]utstanding" rating for its small business participation. The SSEB identified seven strengths and no weaknesses, deficiencies, or uncertainties. The SSEB explained that Pond met or exceeded all socio-economic subcategory target percentages, specifically identified small businesses in its proposal, identified the complexity and variety of the work that the small businesses would perform, and submitted four letters of commitment from participating small businesses. (*Id.* at 5294.)

**4. Price**

As the Corps calculated average pricing across the offers, Tetra Tech, VGS, and Pond all proposed overall prices within the standard deviation. (*Id.* at 5310.) Each offeror's proposed price for each individual CLIN was within the standard deviation, except for the following: VGS's CLIN X002 – Semi-Annual PM, which was lower than one standard deviation from the average and nine labor rates for key personnel that were higher than one standard deviation from the average; Pond had one labor rate for key personnel that was lower than one standard deviation from the average; Tetra Tech had three labor rates for key personnel that were higher than one standard deviation from the average. (*Id.* at 5311-12.)

Tetra Tech, Pond, and VGS were all within the standard deviation for their CM service order markups. Pond and VGS were within the standard deviation for each of their sample CM service order prices. Tetra Tech's proposed sample CM service order prices, however, were more than one standard deviation above the average. (*Id.* at 5312-13.)

Each offeror's overall price was compared to the IGE as well. The lowest offer, Pond's, was 21.19 percent below the IGE, Tetra Tech's offer was 19.93 percent lower than the IGE, and VGS's offer was 18.73 percent lower than the IGE. (*Id.* at 5313.)

**C. Contract Award**

The source selection authority ("SSA"), who is also the contracting officer, executed a source selection decision on June 29, 2026. (AR Tab 52.) After considering the relative merits of each proposal, the SSA determined that Pond's proposal represented the best value to the government, given its technical strengths and lowest evaluated price. (*Id.* at 5333-35.)

## II. PROCEDURAL HISTORY

VGS filed a protest at the Government Accountability Office ("GAO") on July 15, 2026. (AR Tab 63.) The Corps moved for partial dismissal on July 21, 2026, arguing that VGS had failed to state a claim with respect to its protest that the Corps had failed to evaluate the awardee's price for unbalanced pricing. (AR Tab 67 at 6900.) The GAO agreed and indicated that it would "dismiss [VGS]'s allegations related to the agency's evaluation of price for balance at this time because [ ] the protester's arguments here fail to provide a sufficient basis for protest." (AR Tab 70 at 6923.)

Tetra Tech filed its complaint here on August 5, 2026. The GAO subsequently dismissed the balance of VGS's protest because of Tetra Tech's protest. On August 6, 2026, Pond moved to intervene. On August 18, 2026, VGS filed its complaint here. On August 20, 2026, Tetra Tech's and VGS's cases were consolidated. On September 2, 2026, the plaintiffs filed amended complaints (ECF 39; ECF 41) and motions for judgment on the administrative record (ECF 40; ECF 42). On September 16, 2026, the defendant and defendant-intervenor filed their cross-motions for judgment on the administrative record. (ECF 43; ECF 44.) On September 28, 2026, the plaintiffs filed their responses. (ECF 45; ECF 46.) On October 9, 2026, the defendant and defendant-intervenor filed their replies. (ECF 47; ECF 48.) Oral argument was held on October 20, 2026.

## III. JURISDICTION AND STANDING

Under the Tucker Act, as amended by the Administrative Disputes Resolution Act, the Court of Federal Claims has jurisdiction over "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

Tetra Tech and VGS challenge the Corps' award of the PMCM services contract to Pond, alleging that the Corps improperly evaluated the three respective proposals, and that the plaintiffs were prejudiced by the Corps' errors. Tetra Tech's and VGS's claims fall within the Court's bid-protest jurisdiction.

For a plaintiff to have statutory standing to bring a bid protest, it must be an "interested party." 28 U.S.C. § 1491(b)(1); see *CACI, Inc.- Fed. v. United States*, 67 F.4th 1145, 1152 (Fed. Cir. 2023). To qualify as an interested party, an offeror must allege facts, that, if true, "establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006); *see also Percipient.ai, Inc. v. United States*, 104 F.4th 846, 846 (Fed. Cir. 2024), *aff'd en banc on other grounds*, 153 F.4th 1226 (Fed. Cir. 2025), *cert. denied*, 146 S. Ct. 1517 (2026).

In determining whether a protestor has alleged facts demonstrating the "requisite direct economic interest," a court must decide whether those alleged facts show the protestor was prejudiced by the alleged errors. *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996). To establish prejudice for standing purposes in a post-award bid protest, the protestor's complaint must "show that there was a 'substantial chance' it would have received the contract

award but for the alleged error in the procurement process." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (citation omitted)). The "substantial chance" test does not require an offeror to show that, but for the agency's alleged error, it would have been next in line for the contract award, but the offeror must still demonstrate that it had "more than a bare possibility of receiving the award" to have standing. *Precision Asset Mgmt. Corp. v. United States*, 125 Fed. Cl. 228, 233 (2016) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005)). To determine whether it has standing, a protester's allegations are assumed to be true. *See Am. Relocation Connections, LLC v. United States*, 789 F. App'x 221 (Fed. Cir. 2019).

Tetra Tech and VGS are actual bidders for the PMCM services contract. Assuming their allegations to be true, the Corps misevaluated the proposals. Tetra Tech had the same technical and management approach rating and a slightly higher price than Pond and is the incumbent. While VGS only received an acceptable rating for its technical and management approach, its past performance and small business participation ratings are the same as Pond's, and it proposes a price comparable to Pond's. On these alleged facts, both Tetra Tech and VGS have alleged facts sufficient to confer standing to maintain these protests.

## IV. STANDARD OF REVIEW

On a motion for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), the court's review is limited to the administrative record, with findings of fact made as in a trial on a paper record. *See Bannum,* 404 F.3d at 1353-56. The court must determine whether a party has met its burden of proof based solely on the evidence in the administrative record. *Id.* at 1355-56. Genuine issues of material fact will not foreclose judgment on the administrative record. *Id.*; *see also Palantir USG, Inc., v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018).

The Administrative Procedure Act ("APA") "supplies the standard of review in bid protests." *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1374 (Fed. Cir. 2024); *see also Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009). Under the APA standard of review, a court "asks whether the agency's actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Oak Grove*, 116 F.4th at 1374 (quoting 5 U.S.C. § 706(2)).

Bid protests require a court to conduct a two-step analysis. *Bannum*, 404 F.3d at 1351. First, the court must determine whether the government's conduct is "arbitrary and capricious" or "not in accordance with law." *Id.* To find that an agency acted arbitrarily and capriciously, a court must "determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Weeks Marine v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1225 n.4 (Fed. Cir. 2004)).

Under the APA's arbitrary and capricious standard, a court gives considerable deference to the agency's ultimate determination and the individual decisions that went into it. *See Safeguard Base Ops., LLC v. United States*, 989 F.3d 1326, 1343 (Fed. Cir. 2021) (citing *PAI*

*Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010)). The deference afforded to agency determinations is particularly great when the award is based on the best value to the agency. *Galen Med. Assoc, Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004); *see also E.W. Bliss Co., v. United States*, 77 F.3d 445, 449 Fed. Cir. 1996). In a best value award, the evaluation of the relative merits of competing proposals is primarily a matter of administrative discretion. *E.W. Bliss*, 77 F.3d at 449. A reviewing court may not substitute its judgment for that of the agency but must evaluate the basis for the agency's decision only to determine whether it is reasonable, supported by the record before the agency, and consistent with the law. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

If a protester prevails on the first prong of the test, it must then demonstrate that it satisfies the second prong of showing "as a factual matter," that it "was prejudiced by" the unlawful or arbitrary conduct. *Bannum,* 404 F.3d at 1351. "[T]he second step is always required before setting aside a bid award, regardless of whether the error identified at the first step was arbitrary and capricious action or, instead, a violation of law." *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997 (Fed. Cir. 2021).

## V. DISCUSSION

Both Tetra Tech and VGS make several arguments in support of their contention that the Corps' award of the solicitation to Pond was arbitrary and capricious. These arguments span all four factors: technical and management approach, past performance, small business participation, and price.

Tetra Tech and VGS both argue that the Corps should have issued Pond a deficiency and disqualified its proposal for failing to complete in full the required sample service order forms. (ECF 40 at 20; ECF 42 at 21.) The plaintiffs also present the following challenges to the Corps' technical and management evaluations. VGS argues that the Corps misevaluated its technical and management approach by: (1) assigning its proposal a weakness and an uncertainty without any basis (ECF 40 at 28, 31); and (2) failing to award its proposal strengths for several elements (*Id.* at 33). Tetra Tech argues that the Corps misevaluated the technical and management proposals by: (1) failing to follow the solicitation's criteria by assigning Tetra Tech's proposal a "[g]ood" rating when, based on the criteria set forth in the solicitation, it warranted an "[o]utstanding" rating (ECF 42 at 14); and (2) arbitrarily assigning a strength to Pond's proposal for its safety-training program, when it failed to award a strength for Tetra Tech's similar training program (*Id.* at 17).

On past performance, Tetra Tech argues that the Corps erred by: (1) failing to follow the solicitation's criteria in evaluating Tetra Tech's past performance because it incorrectly weighed the recency and relevancy of Tetra Tech's past performance in assigning a rating of "[s]atisfactory [c]onfidence" (ECF 42 at 22); (2) relying solely on adjectival CPARS ratings, rather than conducting a qualitative evaluation (*Id.* at 26); and (3) failing to adhere to the solicitation's criteria of recency and relevancy when it did not consider the annual variances in the quality of Pond's past performance (*Id.* at 30). VGS assigns no errors related to past performance.

On small business participation, Tetra Tech argues that the Corps failed to follow the terms of the solicitation by: (1) awarding a strength for each MQR exceeded and an additional strength for providing letters of commitment, when neither criterion was identified in the solicitation (*Id*. at 32); and (2) failing to consider Tetra Tech's use of small business performance in prior relevant contracts (*Id*. at 37). VGS assigns no errors related to small business participation.

Finally, with respect to price, both Tetra Tech and VGS argue that the Corps erred by not reviewing proposals for unbalanced pricing, as required by RFO 15.404-6. (ECF 40 at 7; ECF 42 at 40-41.) VGS expands on this argument, arguing also that the Corps' pricing analysis was flawed due to the inclusion of incomplete data from an offer that the Corps deemed unawardable. (ECF 40 at 11.)

### A. Technical and Management Approach

#### 1. Pond's Failure to Complete its Sample Service Order Forms

Offerors had to submit two sample service order forms with the technical and management approach portion of their proposal. In its sample service order forms, Pond proposed to use a subcontractor. (AR Tab 22b at 3240-41.) Pond did not complete the fields of the forms requiring offerors to describe the tasks to be completed by subcontractors and to specify the costs associated with any subcontractors. (*Id*.; AR Tab 50 at 5263.)

The solicitation required that each offeror "shall provide information outlined in Attachment 0003, Technical Evaluation Form." (AR Tab 20c at 3105.) Under the technical factor, the solicitation required offerors to submit two sample service order forms reflected in Attachment 0003.[2] (AR Tab 21a at 3127-28.) Section 10.0 of Attachment 0003 provides: "[f]or each listed defect, the Offeror shall complete a Service Order (SO) form in full. Ensure that all fields are filled out. The Offeror must complete a fully populated Service Order (SO) form for each identified defect." (*Id*.) The solicitation noted that the two sample service order forms would be evaluated to determine "the approach to understanding and performing Service Orders at a fair and reasonable price" and "for completeness." (AR Tab 20c at 3111.)

The solicitation directed that, when completing the sample service order forms, offerors were to include "ALL prime contractor costs associated with the service order" in "the service order fee" cell of the forms. (AR Tab 16b.) The solicitation went on to provide that the prime

---

[2] Most of the work to be performed under this solicitation is CM. When, during performance of the contract, the contractor identifies an issue that needs to be addressed, it communicates to the agency through service order forms that identify the nature of the issue, the labor and parts required to fix the issue, and the estimated cost. The sample forms offerors had to complete were designed so offerors could demonstrate how they would provide services when CM was needed during contract performance. (AR Tab 16c at 2250.) The forms were also designed to allow the SSEB to evaluate how well each offeror understood the contract requirements and how effectively it would communicate any required CM to the agency during contract performance.

contractor service order fee shall include "the total subcontracted costs, prime contractor material cost, and on-site prime contractor labor cost." (*Id.*) The solicitation did not provide specific instructions for completing either the "Subcontractor(s) Name/Task" fields or "Subcontractor Total Costs" field. (*Id.*) The instructions also provided that "[c]ells not applicable should be left blank." (*Id.*)

Pond's service order forms provided its anticipated labor requirements and related wages, the estimated hours needed to complete the work, and the costs associated with materials and equipment. (AR Tab 22b at 3240-41.) On both service order forms, Pond identified a subcontractor and identified the costs associated with carrying out the CM. (*Id.*) Pond did not separately identify the costs associated with its use of its proposed subcontractor.

The SSEB concluded that Pond's sample service order forms were incomplete. (AR Tab 22b at 3240-41; AR Tab 50 at 5263.) Although Pond had proposed a subcontractor as a participant in performance on both of its sample service order forms, it had neglected to complete the portions of the forms (1) describing the tasks to be completed by that subcontractor and (2) detailing the subcontractor's costs. (*Id.*) Specifically, in the first service order form, Pond did not provide subcontractor costs in the Subcontractor Name or Subcontractor Total Costs fields. (AR Tab 22b at 3240.) Instead, the costs associated with its subcontractor were included within the costs listed under prime contractor material, equipment, and other expenses. (*Id.*) In the second form, Pond again listed its subcontractor. (*Id.*) Pond proceeded to list the cost of its labor and materials, equipment, and other expenses, but did not separately apportion its subcontractor costs. (AR Tab 22b at 3241.) The SSEB concluded that by failing to include the missing information, Pond did "not clearly demonstrate an understanding of the requirements," resulting in "increase[d] risk to the Government of unsuccessful contract performance." (AR Tab 50 at 5263.) The SSEB therefore assigned Pond's proposal a weakness.

Tetra Tech and VGS argue that the missing information should have led the SSEB to disqualify Pond's proposal for a deficiency and not merely assign a weakness. The plaintiffs argue that the solicitation makes clear that a failure to submit fully populated sample service order forms is a disqualifying deficiency because the solicitation provides that sample service order forms "shall" be completed in full. Thus, according to the plaintiffs, the failure to complete these sample forms in full should obligate the Corps to disqualify Pond for two reasons: first, the completion of the entire service order forms was a material term of the solicitation, and the failure to conform to that term renders the proposal unawardable, *see Oak Grove Techs.*, 116 F.4th at 1379; second, Pond's failure to complete the sample service order forms in full was "a material failure of a proposal to meet the Government requirement." (AR 20c at 3110.) Thus, the Corps acted arbitrarily in assigning Pond only a weakness instead of a deficiency.

The plaintiffs' argument poses two questions: (1) is the completion in full of the sample service order forms material to the solicitation, such that failure to complete them in full renders a proposal unawardable; and (2) if not a material failure, did the Corps nonetheless act arbitrarily and capriciously in assigning Pond a weakness, as opposed to a deficiency, for Pond's failure to complete in full its two sample service order forms.

"[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal

violates the procurement statutes and regulations." *E.W. Bliss Co.*, 77 F.3d at 448 (internal quotes omitted). "So long as the requirement serves a substantive purpose, it is material." *ManTech Advanced Sys. Int'l, Inc. v. United States*, 141 Fed. Cl. 493, 507 (2019). Material requirements are those necessary for a proposal to "provide the exact thing called for in the request for proposals[.]" *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)). Thus, errors are material when they (1) violate an express provision in the RFP and (2) the provision served a substantive purpose. *ManTech*, 141 Fed. Cl. at 506 (citation omitted). "A substantive purpose is something important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid." *Id.* Whether a term or condition of a solicitation is a material requirement presents a question of law reviewed de novo. *See Safeguard Base Ops.*, 989 F.3d at 1343-44.

To determine whether a solicitation requirement is "material," a court must interpret the solicitation. *ManTech Telecoms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 67 (2001), *aff'd*, 30 F. App'x 995 (Fed. Cir. 2002). Interpretation of a solicitation "begin[s] with the plain language of the document." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004). "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them." *Id.*

The solicitation itself required that "ALL prime contractor costs associated with the service order shall be included in the service order fee." (AR Tab 16b.) It did not otherwise provide specific instructions for completing the "Subcontractor(s) Name/Task" or "Subcontractor Total Costs" fields. (*Id.*) The instructions also specified that "[c]ells not applicable should be left blank." (*Id.*) While offerors were thus required to provide all their costs, the solicitation did not specify how offerors should fill out the sample service order forms or which cells applied to each offeror. Pond provided all its costs associated with the sample maintenance requests and then left blank the cells it considered to be inapplicable. Thus, Pond's sample service order forms met these requirements.

The solicitation also specified that the Corps would evaluate each sample service order form for completeness; *i.e.*, the Corps was to determine whether each offeror appropriately completed the applicable cells and left blank any inapplicable cells. In context, the need for completeness in filling out the sample forms would reflect offerors' understanding of the technical requirements of the contract and what was required of the awardee. The exercise was designed to reveal whether offerors could identify which fields were necessary for a given maintenance task. Thus, completeness as an evaluation factor was not a binary question as to whether the forms were complete or incomplete. Instead, the completeness of the forms would allow the Corps to determine how completely each form was filled out and use that determination as evidence of an offeror's technical understanding.

The Corps' evaluation of Pond's incomplete sample forms is consistent with that purpose. Pond submitted both sample service order forms with its technical and management approach and provided all its costs associated with the service orders. In doing so, it satisfied the material terms of the solicitation. The Corps concluded, based on the incomplete forms, that Pond did not fully understand how to complete the forms properly and assigned it a weakness.

If the figures provided in the sample service order forms were binding on offerors or affected the price analysis, then the missing subcontractor costs may have been material, even though the solicitation did not specify that these data points were required. The sample service order forms were, however, neither binding on offerors nor relevant to the pricing analysis. (AR Tab 20c at 3108-09) (specifying that "only the rates and values listed in the price worksheet" would be binding and evaluated as part of the pricing analysis). Because the Corps evaluated the sample service order forms to determine each offeror's understanding of the requirements of the PWS and its ability to perform CM under service orders at a fair and reasonable price, the need to detail fully the tasks a subcontractor would perform, and the costs associated with those tasks, was not material to the price of any offer, including Pond's. *See ManTech*, 141 Fed. Cl. at 506.

Pond's failure to complete the two subcontractor-related cells within the sample forms did not require the Corps to conclude that Pond had failed to meet a material solicitation requirement, and the Corps was not required to reject Pond's proposal as unawardable.

Even if the completion in full of the sample service order forms was not a material requirement of the solicitation, the plaintiffs argue that the Corps acted arbitrarily and capriciously in assigning Pond a weakness, as opposed to a deficiency, for not completing the sample forms in full.

The solicitation defines a deficiency as "a material failure of a proposal to meet the Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level" and a weakness as "a flaw in the proposal that increased the risk of unsuccessful contract performance." (AR Tab 20c at 3110-11.)

Agencies generally have broad discretion to evaluate the strengths and weaknesses of proposals as they deem appropriate. *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010). FAR 15.001 defines a deficiency as "a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." When a solicitation's definition of deficiency does not align with the regulatory definition of deficiency but instead specifically identifies the failure to meet solicitation requirements as a deficiency, the agency must assign a deficiency when an offeror fails to meet any of those specific requirements. *Sys. Dynamics Int'l, Inc. v. United States*, 167 Fed. Cl. 780, 794-95 (2023). When a solicitation's definition of a deficiency aligns with FAR 15.001 (and now RFO 15.001), however, the agency retains broad discretion to determine whether an offeror's proposal is deficient. *L3Harris Techs., Inc. v. United States,* No. 24-129C, 2024 WL 1798735, at *11 (Fed. Cl. Apr. 30, 2024).

Here, the solicitation aligns with the language of FAR 15.001.[3] (AR Tab 20c at 3110-11.) The Corps thus retained its broad discretion to determine whether a shortcoming in any proposal rose to the level of a deficiency or was merely a weakness.

[3] On March 5, 2026, the Department of Defense issued a memorandum directing contracting officers to use the revised FAR Part 15 (RFO), published on the Revolutionary FAR Overhaul web page, in lieu of FAR Part 15. Memorandum from John M. Tenaglia, Principal

In setting out the requirements for the sample service order forms, the solicitation required that "ALL prime contractor costs associated with the service order shall be included in the service order fee," but it did not provide specific instructions for either the "Subcontractor(s) Name/Task" fields or "Subcontractor Total Costs" field. (AR Tab 16b.) Further, the instructions also provided that for Part III, "[c]ells not applicable should be left blank." (*Id.*) Thus, the solicitation only expressly requires offerors to document prime contractor costs, but the necessary detail for subcontractor costs was not identified as a requirement. Because the forms were to be prepared based on a hypothetical problem, it was left to each offeror's discretion to determine which fields applied to the hypothetical responses it would propose.

The SSEB noted Pond's failure to include hypothetical subcontractor costs in a specific field and concluded that this failure indicated a lack of understanding of the solicitation requirements. (AR Tab 50 at 5263.) The Corps also concluded, however, "that the error did not amount to a lack of technical understanding," but was instead an apparent "paperwork error on a sample form." (AR Tab 52 at 5334.) The Corps accordingly concluded that Pond's failure to include the information associated with its subcontractor on its two sample service order forms did "not diminish the overall quality of Pond's proposal," but was "minor or administrative in nature and does not represent a systemic risk to cost, schedule, or performance." (*Id.* at 5335.)

The solicitation on its own terms does not require the Corps to have found that Pond's failure to include the subcontractor information constitutes a deficiency that warrants disqualification. Instead, the Corps retained the discretion to determine the gravity of the shortcoming. The SSEB and other Corps evaluators, exercising this discretion, explained the basis for their assignment of a weakness and not a deficiency. That conclusion is not arbitrary or capricious.

**2. The Weakness for VGS's FMP Proposal**

The Corps assigned VGS a weakness for its FMPs, finding that its proposal "does not clearly demonstrate an understanding of the requirements and increases risk to the Government of unsuccessful contract performance" due to an "additive table/layer embedded into the FMP for Government review processing throughout the life of the contract." (AR Tab 50 at 5272-73.)

---

Dir., Def. Pricing, Contracting & Acquisition Pol'y, to Dep't of Def. Acquisition Officials, Class Deviation 2026-00048, Revolutionary Federal Acquisition Regulation (FAR) Overhaul Part 15, Defense FAR Supplement (DFARS) Part 215 (Mar. 5. 2026) ("RFO Memo"). The RFO defines a "deficiency" as "any part of an offer that does not conform to a material requirement of a RFP. A material requirement is one that affects price, quantity, quality, or delivery, or that the RFP requires to be met at the time of proposal submission." RFO 15.001. Despite the RFO Memo, the Corps elected to use the definition of "deficiency" from the former FAR Part 15 in this procurement. (AR Tab 20c at 3110-11.) The solicitation also provides that a contract will not be awarded to an offeror "whose proposal contains a deficiency, as defined in RFO 15.001." (AR Tab 20c at 3109.) The solicitation does not deviate from either of these regulatory definitions of "deficiency."

VGS argues that the weakness assigned to its FMPs is arbitrary, reflecting the Corps' failure to evaluate the proposal properly.

An agency's technical evaluation receives great deference, and courts typically will not second-guess it. Agencies are best equipped to perform the evaluation of technical aspects of contract proposals to determine suitability and compliance with agency needs. *E.W. Bliss Co.*, 77 F.3d at 449. "[W]here an agency's decisions are highly technical in nature . . . judicial restraint is appropriate and proper." *Electro-Methods, Inc. v. United States*, 7 Cl. Ct. 755, 762 (1985); *see also FPC v. Florida Power & Light Co.* 404 U.S. 453, 464 (1972).

VGS argues that its proposal met the terms of the solicitation, and that the weakness assigned by the Corps "is irrational, unexplained, and inconsistent with the stated criteria." (ECF 40 at 30.) The solicitation requires the awardee to update and maintain the government-provided FMPs by cross walking assets and identifying mismatches and missing or undocumented equipment. (AR Tab 16a at 1987, 2013.) "[A]ny variances in the Government provided FMPs must be captured within the updated FMPs." (AR Tab 16a at 2013.) The solicitation prescribed that the contractor would update the FMPs by "[a]nnotat[ing] variances in component additions or deletions using red font and for any deletions in equipment, use a strikethrough effect." (*Id.*) Throughout the lifecycle of the contract, additions, upgrades, or removals of equipment affecting the FMPs were to be consolidated into the government-provided FMP and not embedded in the FMP through an additional verification layer or crosswalk table.

VGS, however, proposed to use its own crosswalk table to [* * *]. (AR Tab 25b at 3941.) VGS proposed that, once compiled, its crosswalk table would be [* * *]. (*Id.*) VGS also proposed that [* * *]. (*Id.*)

VGS argues that its proposed method of updating and maintaining the government-provided FMPs is comprehensive and "demonstrate[s] both a deep understanding of those requirements and a path to successful performance without risk to the Government." (ECF 40 at 30.) The Corps disagreed. The SSEB explained that VGS was being assigned a weakness for providing an "additive table/layer embedded into the FMP for [g]overnment review processing throughout the life of the contract." (AR Tab 50 at 5273.) The SSEB concluded that the proposal fails to show that VGS clearly understands the requirements of the PWS that the contractor directly update the government-provided FMPs. (*Id.*) The SSA agreed with this evaluation, noting in the source selection decision that by embedding an additional crosswalk table, VGS was "placing an additional Facility Maintenance Plan burden on the Government." (AR Tab 52 at 5332.)

The Corps documented a rational basis, consistent with the evaluation criteria, for the finding that VGS's proposal constituted a weakness under the solicitation. (AR Tab 16e at 2266; AR Tab 50 at 5273.) VGS simply disagrees with that conclusion, but it is explained and supported by the record. The rating is not arbitrary and capricious.

### 3. The Uncertainty Assigned to VGS for Mislabeled Data

The solicitation required the submission of both OSHA Injury and Illness Data and OSHA TRIR, two separate data sets. (AR Tab 16c at 2249.) VGS's proposal provided "[VGS] 5

year TRIR" and "[VGS] Total 2025 TRIR." (AR Tab 25b at 3938.) VGS argues its two data sets correspond to the two required data sets. The SSEB believed the first set of data was mislabeled as TRIR, when it should have been labeled as injury and illness data. Thus, the SSEB gave VGS an uncertainty and recommended resolving the uncertainty if VGS was awarded the contract. (AR Tab 50 at 5274.)

VGS argues that this uncertainty was arbitrary, asserting that there is "no rational basis for the [Corps] to conclude that the use of a different prescriptive title caused true uncertainty about the nature of the data being provided," because the form and format of the data made clear it was the OSHA Injury and Illness Data set. (ECF 40 at 31.) VGS argues that it was thus "arbitrary, irrational, and unequal" to use this uncertainty as a basis to find an elevated risk from VGS's proposal when Pond had a similar uncertainty that did not amount to a similar elevated risk. (*Id*. at 32.)

The solicitation defined an "uncertainty" as "any aspect of a non-cost/price factor proposal for which the intent of the offer is unclear." (AR Tab 16e at 2266.) The mislabeled data set suggested the submission of either the wrong data or duplicative data, which would be an error in either case.

VGS does not dispute that it mislabeled its data; instead, it argues that this uncertainty was unreasonable because the Corps should have known what VGS meant by its submission of the two distinct data sets. Under the solicitation, however, an uncertainty is defined by reference to whether the offeror's intent was unclear. The submission of mislabeled data creates exactly the type of error that can reflect uncertainty regarding the offeror's intent. The Corps' conclusion is consistent with the solicitation and the record and is entitled to the deference accorded to agency's decisions addressing the minutiae of procurements. *See Office Design Grp. v. United States*, 951 F.3d 1366, 1373 (Fed. Cir. 2020).

To the extent that VGS argues that its uncertainty resulted in the Corps assigning its proposal an elevated risk (ECF 40 at 32), the SSEB did not find that the uncertainty created any risk to performance, merely noting this apparent clerical error, so that "in the event this offeror is selected for award, this uncertainty be resolved." (AR Tab 50 at 5274.) The SSA likewise did not indicate in her award decision that the uncertainty reflected any risk to performance. (AR Tab 52 at 5332.)

To the extent that VGS argues that it was treated unequally because Pond was not assigned elevated risk for the uncertainty it was assigned, the record does not support the claim. To show disparate treatment, the plaintiff must show "that the agency unreasonably downgraded [the protestor's] proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Office Design Grp.*, 951 F.3d at 1372. Here, the SSEB issued both Pond and VGS uncertainties for their similarly mislabeled data, mentioned both uncertainties in explaining the basis for its rating of each proposal, and the SSA mentioned both uncertainties in her award decision. (*Compare* AR Tab 50 at 5261 *with id*. at 5272; *compare* AR Tab 52 at 5330 *with id*. at 5332.) Thus, the Corps treated both offerors' similar mislabeling errors in the same manner. Thus, the Corps' assignment of an uncertainty to VGS was not arbitrary and capricious, VGS's uncertainty did not result in the Corps assigning its proposal an

elevated risk, and the Corps did not treat VGS's uncertainty differently than Pond's uncertainty in the evaluation process.

### 4. The Evaluation of VGS's Proposal

The SSEB assigned VGS one strength, one weakness, one uncertainty, and no deficiencies. VGS received its strength for including a [* * *] not required by the PWS. VGS argues that the SSEB irrationally failed to recognize four elements of its proposal that should have also been denoted as strengths. First, VGS proposed an [* * *], an element that goes beyond what the solicitation requires. Second, VGS proposed key personnel whose experience exceeds that required by the solicitation. VGS argues the Corps failed to recognize the value of this aspect of its proposal. Third, VGS argues that its proposal includes a unique Comprehensive Computerized Maintenance Management System ("CCMMS") that exceeds solicitation requirements and would substantially reduce risk to contract performance. Fourth, VGS argues that its approach to the sample service orders was exceptionally detailed, thorough, and transparent and should have been recognized as a strength. VGS argues that these four elements of its proposal provide clear benefits to the Corps and were not addressed and not recognized as strengths in its technical evaluation, rendering that evaluation arbitrary and irrational.

"Determining whether a proposal merits a strength because it goes above and beyond the agency's requirements involves a judgment that is quintessentially the agency's to make." *Tech. Innovation Alliance LLC v. United States*, 149 Fed. Cl. 105, 156 (2020). In a bid protest, "[t]he Court's role is not to be the second set of eyes for every technical determination by an agency because that approach would allow the protestors to 'unilaterally impose upon [ ] an agency the duty to explain why any feature in its proposal was not found to be a strength, merely by disputing this determination.'" *DigiFlight v. United States*, 167 Fed. Cl. 158, 167 (2023) (quoting *Telos Corp. v. United States*, 129 Fed. Cl. 573, 577 (2016)), *appeal dismissed*, No. 2024-1051, 2023 WL7179084 (Fed. Cir. Nov. 1, 2023). "[W]hen an agency is not finding fault with a particular approach to a task, or noting its superior quality, the Court cannot see how the agency should be required to explain its finding—that the approach is merely adequate—in any detail." *Inspace 21 LLC v. United States*, 128 Fed. Cl. 69, 89 (2016). "[T]he notion that when an agency finds aspects of a protester's proposal to be adequate, and thus not material to the best value determination, each adequacy determination must nevertheless be explained for the award decision to be rational, has no basis in law or reason." *Telos Corp.*, 129 Fed. Cl. at 577.

VGS cannot overcome these well-reasoned statements of the law and the judicial role in reviewing agency evaluations of the multiple elements of contract proposals. VGS's argument regarding the Corps' failure to note elements of its proposal and accord them strengths "incorrectly equates the [Corps'] decision to not elaborate on every aspect of [its] proposal with the failure to 'provide a coherent and reasonable explanation' of [its] evaluation." *DigiFlight*, 167 Fed. Cl. at 166 (quoting *FFL Pro LLC v. United States*, 124 Fed. Cl. 536, 561 (2015)).

VGS argues that these four elements exceed the solicitation requirements, but exceeding solicitation requirements does not always equate to receiving a strength, unless the solicitation so directs. It is quintessentially a determination to be left to the agency's technical expertise and understanding of its own requirements to decide what elements of an offer merit a strength because they exceed the agency's requirements to the advantage of the government and what

elements exceed solicitation requirements but fail to provide additional advantage to the government. *See Tech. Innovation Alliance*, 149 Fed. Cl. at 156.

The Corps does not have to explain why every feature of VGS's technical proposal warranted or did not warrant a strength. *See Telos Corp. v. United States*, 129 Fed. Cl. at 577. VGS fails to show that the Corps departed from the solicitation's evaluation criteria. VGS simply restates what it provided in its proposal and asserts that, because these four elements exceed the solicitation's requirements, the decision not to accord them strengths must be irrational. This argument amounts to nothing more than disagreement with the agency's conclusions. It is not the judiciary's role to second-guess the agency's determination of the value of these aspects of the proposal. The decision not to assign a strength to a particular feature of VGS's proposal does not, by itself, render the evaluation irrational, and a court will not substitute its judgment for that of the agency merely because an offeror believes that aspects of its proposal warranted greater recognition.

**5. Tetra Tech's Technical and Management Approach**

The Corps rated Tetra Tech's technical and management approach "[g]ood." Its proposal contained two strengths and no weaknesses, deficiencies, or uncertainties. Tetra Tech was assigned a strength for its ability to [* * *]. It received a second strength for its ability to perform [* * *]. (AR Tab 50 at 5270-71.)

Tetra Tech argues, however, that its proposal warranted an outstanding rating. Under the solicitation, an outstanding rating would be assigned when a "[p]roposal demonstrates an exceptional approach and understanding of the requirements and contains multiple strengths and/or at least one significant strength, and risk of unsuccessful performance is low." (AR Tab 20c at 3112.) A good rating was assigned for a proposal that reflects a "thorough approach and understanding of the requirements and contains at least one strength or significant strength, and risk of unsuccessful performance is low to moderate." (*Id.*) Tetra Tech argues that, with two strengths and no identified risks of unsuccessful performance, its proposal should have been rated outstanding.

The "qualitative evaluation of proposals is not governed by a simple count of strengths and weaknesses." *North South Consulting Grp., LLC v. United States*, 141 Fed. Cl. 549, 557 (2019) (internal quotations omitted); *see also EFW, Inc. v. United States*, 148 Fed. Cl. 396, 409 (2020). Ultimately, "[t]he rating itself is less important than the rationale behind it." *Lockheed Martin Corp. v. United States*, 124 Fed. Cl. 709, 728 (2016).

When distinguishing between a good and an outstanding proposal, "[t]he difference between the two ratings [ ] largely turn[s] on whether the [agency] found the proposed offeror's technical approach to be 'thorough' and thus '[g]ood' or 'exceptional' and thus '[o]utstanding.'" *Kiewit Infrastructure West Co. v. United States*, 137 Fed. Cl. 689, 702 (2018). A "court will not second-guess the [agency]'s judgment that [a] proposal was 'thorough' but not 'exceptional.'" *Id.*

To merit an outstanding rating under the solicitation, a proposal must first demonstrate "an exceptional approach and understanding of the requirements," in addition to containing

multiple strengths and presenting low risk of unsuccessful performance. (AR Tab 20c at 3112.) A good proposal, on the other hand, "indicates a thorough approach and understanding of the requirements." (*Id.*) The SSEB documented its determination that Tetra Tech's "overall proposal meets requirements and indicates a thorough approach and understanding of th[e] requirements." (AR Tab 50 at 5270.) The SSEB awarded Tetra Tech's proposal two strengths and concluded that these strengths reflected that "the overall proposal meets requirements and indicates a thorough approach and understanding of the requirements," warranting a "[g]ood" rating. (*Id.*)

Simply receiving two strengths and no weaknesses does not guarantee an outstanding rating under the solicitation. The Corps retained the discretion to distinguish between an exceptional approach and a thorough approach; the former merited an outstanding rating, and the latter did not. The decision to rate Tetra Tech's proposal for technical and management approach as good was reasonable and adequately documented.

**6. Disparate Treatment of Tetra Tech**

The Corps awarded Pond a strength for its proposed safety program, which was a [* * *] program that Pond developed to supplement the safety training required by the solicitation. (*Id.* at 5261.) The Corps concluded that Pond's proposed additional [* * *], combined with Pond's demonstrated "dedication to safety culture" over the previous five years, significantly reduced the risk of unsuccessful performance. (*Id.* at 5262.)

Tetra Tech argues the Corps treated it disparately by assigning Pond a strength for its safety training when it had proposed its own safety training that was not assigned a strength. Tetra Tech asserts its safety training is indistinguishable, if not even more robust, than Pond's safety training. Thus, according to Tetra Tech, it should have also received a strength.

To prove disparate treatment, a protester must show either: (1) "that the agency unreasonably downgraded [the protestor's] proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals"; or (2) "that the agency inconsistently applied objective solicitation requirements between [the protestor] and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Office Design Grp.*, 951 F.3d at 1372. To prevail on a claim of disparate treatment, then, the proposals under review must be "substantively indistinguishable." It follows that "[i]t is not unreasonable for agencies to evaluate differing proposals differently." *Jacobs Eng'g Grp., Inc. v. United States*, 177 Fed. Cl. 754, 775-76 (2025).

Pond proposed:

> All Pond and subcontractor personnel receive documented safety training on the requirements of [* * *]. The [* * *] complete Pond's [* * *], at a minimum. All required safety and health training courses include direct access to qualified and experienced instructors for comments, questions, and clarifications. Courses are offered [* * *].

(AR Tab 22b at 3230.)

Tetra Tech proposed:

[* * *].

(AR Tab 24b at 3683.)

The two safety-training proposals are substantively different. Pond proposed [* * *], in addition to the [* * *]. Tetra Tech only proposed that its [* * *]. Pond proposes [* * *], but Tetra Tech proposed a [* * *]. This distinction alone supports the rejection of Tetra Tech's disparate treatment claim.

Additionally, Pond and Tetra Tech had different historical injury and illness data. The SSEB found Pond's qualitatively better safety record to be an indicator of a "thorough and thoughtful approach to safety and quality." (AR Tab 50 at 5262.) Over the preceding five years, Tetra Tech had [* * *] injuries and [* * *] illnesses. (AR Tab 24b at 3684.) During that same period, Pond had no injuries or illnesses. (AR Tab 22b at 3231.)

The proposed safety training and the underlying safety data between Pond and Tetra Tech were not "indistinguishable." Indeed, Tetra Tech's argument admits as much when it argues concurrently that the two proposals are indistinguishable and that its safety training proposal was more robust than Pond's. (ECF 42 at 20.) In doing so, Tetra Tech concedes that the two proposals were different, and it was therefore permissible for the Corps to evaluate the two proposals differently. *See QTC Medical Servs, Inc. v. United States*, ___ Fed. Cl. ___, Nos. 26-683, 26-684, 2026 WL 3268513, at *12 (Fed. Cl. Oct. 9, 2026). Tetra Tech's claim of disparate treatment fails.

**B. Past Performance**

Tetra Tech makes three arguments pertaining to the Corps' evaluation of offerors' past performance (VGS presents no claims on past performance). First, Tetra Tech argues that the Corps failed to weigh properly the recency and relevancy of the past performance references. (ECF 42 at 22.) Second, Tetra Tech argues the Corps irrationally evaluated past performance by evaluating only the adjectival ratings, rather than examining the actual quality of the references. (*Id*. at 26.) Third, Tetra Tech argues that the evaluation of Pond's past performance was arbitrary because the Corps "failed to consider that Pond's quality of work varies greatly on a year-to-year basis and not all of Pond's references were very relevant." (*Id*. at 30.) Tetra Tech contends that even though Pond received mostly exceptional ratings and one very good rating for its most recent project, its two older projects consisted largely of satisfactory ratings. Thus, although Pond's most recent reference provided strong ratings, its two older references show that Pond's performance varies and is not consistently exceptional. Tetra Tech also argues that only two of Pond's three references were very relevant.

"In the bid protest context, the assignment of a past performance rating is reviewed 'only to ensure that it was reasonable and consistent with the stated evaluation criteria and applicable statutes and regulations, since determining the relative merits of the offerors' past performance is primarily a matter within the contracting agency's discretion.'" *Todd Constr., L.P. v. United States*, 88 Fed. Cl. 235, 247 (2009) (quoting *Clean Venture, Inc.*, B-284176, 2000 WL 253581, at *3 (Comp. Gen. Mar. 6, 2000)), *aff'd*, 656 F.3d 1306 (Fed. Cir. 2011). "Evaluation of past performance is 'within the discretion of the contracting agency and will not be disturbed unless it

is unreasonable or inconsistent with the terms of the solicitation or applicable statutes or regulations.'" *Ft. Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 599 (2006) (quoting *Consol. Eng'g Servs. v. United States*, 64 Fed. Cl. 617, 637 (2005)). Courts "give 'the greatest deference possible . . . to the agency' when reviewing an agency's past performance analysis." *Tech. Sys. v. United States*, 173 Fed. Cl. 677, 687 (2024) (quoting *Dynamic Sys. Tech., Inc. v. United States*, 127 Fed. Cl. 551, 562 (2016) (quoting *Sci. & Mgmt. Res., Inc. v. United States*, 117 Fed. Cl. 54, 65 (2014))). An agency's "deference is not unlimited," however, and a court "draw[s] the line at irrationality." *GJJ Eng'g Solutions, LLC v. United States*, 161 Fed. Cl. 556, 568 (2022). "'If an agency's evaluation of proposals differs significantly from the process disclosed in the solicitation, the agency's decision lacks a rational basis.'" *Bluewater Mgmt. Group, LLC v. United States*, 150 Fed. Cl. 588, 614 (2020) (quoting *Lab. Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 650 (2014)).

**1. Recency and Relevancy of Tetra Tech's References**

The solicitation explained that "[m]ore relevant past performance will be treated as a stronger predictor of future success and will therefore have more influence on the overall performance confidence assessment than past performance of lesser relevance." (AR Tab 20c at 3113.) According to Tetra Tech, it submitted five recent and very relevant past performance references from past contracts nearly identical to the services the Corps was solicitating yet received only a satisfactory confidence rating. Tetra Tech argues that the Corps' evaluation of its past performance was irrational given these references. Tetra Tech also argues that the Corps engaged in disparate treatment by giving greater weight to the recency and relevancy of Pond's and VGS's references than it did to its references.

Tetra Tech is the incumbent, and its five past performance references were recent and very relevant, as the Corps concluded. While more relevant past performance references were to be treated as a stronger predictor of future success, the Corps was also to weigh the quality of an offeror's past performance by looking at that offeror's CPARS ratings and the explanations behind those ratings. Tetra Tech's ratings were generally satisfactory, but Tetra Tech also had two marginal ratings related to [* * *]. (AR Tab 50 at 5283.) The Corps concluded that these ratings reflected satisfactory, rather than substantial, confidence in future performance, despite those performances being recent and very relevant. That conclusion is explained and supported by the record.

Tetra Tech was not treated disparately compared to Pond and VGS because the Corps applied the solicitation requirements equally to all offerors, and the three offers were not substantially indistinguishable. *See Office Design Grp.*, 951 F.3d at 1372. The Corps found that only two of Pond's three references were very relevant and assigned it a "[s]ubstantial [c]onfidence" rating. Similarly, although the Corps found all five of VGS's references to be recent and very relevant, the majority of VGS's CPARS ratings were satisfactory, with only four of 29 CPARS ratings being very good. VGS also received a substantial confidence rating.

From the ratings assigned to the other offerors, Tetra Tech draws the conclusion that it was treated disparately by the Corps when it was assigned a "[s]atisfactory [c]onfidence" rating, as opposed to Pond's and VGS's "[s]ubstantial [c]onfidence" ratings, even though it too had what it considers to be more relevant and recent references than either of those offerors.

Tetra Tech again ignores the quality of its past performance as an element factoring into an offeror's likelihood of future success. Tetra Tech's quality of past performance was inferior to that of both Pond and VGS. Pond's CPARS ratings ranged from satisfactory to exceptional. (AR Tab 50 at 5280.) VGS's CPARS ratings ranged from satisfactory to very good. (*Id*. at 5286-87.) The Corps concluded that Pond's above average CPARS ratings were a strong indicator of future success, despite some of its past performance being less relevant. The Corps also concluded that VGS's average CPARS ratings, when considering that its past performance was very relevant, were also a strong indicator of future success. Tetra Tech, on the other hand, received satisfactory and marginal ratings, which, despite its past performance being very relevant, is less of an indicator of future success. The difference in the three proposals is facially apparent; where Pond and VGS have exceeded expectations in their recent and relevant past performance, Tetra Tech has not. Thus, the Corps neither acted arbitrarily and capriciously when assigning Tetra Tech a satisfactory confidence rating nor engaged in disparate treatment of Tetra Tech's proposal.

**2. Reliance on Adjectival Ratings**

In evaluating past performance, an agency must look beyond the adjectival ratings of offerors' references and examine the quality of the offeror's work. *See Frawner Corp. v. United States*, 161 Fed. Cl. 420, 451 (2022). Tetra Tech argues that the Corps failed to look behind the adjectival ratings on its CPARS ratings and PPQs and weigh the comments supporting the ratings. If it had done so, the Corps would have found that Tetra Tech's satisfactory ratings did not fully elucidate Tetra Tech's consistent pattern of exceeding performance expectations. Specifically, Tetra Tech notes that the SSEB found that "there was no narrative provided to explain the details of the two marginal ratings," and the SSEB could therefore not have looked behind every adjectival rating. At oral argument, Tetra Tech proposed that the Corps needed to contact the agency officials who had assigned the unexplained adjectival ratings to learn what led to those ratings.

The solicitation provided that the "[r]eview of the quality of [past performance] will be based on CPARS ratings or PPQ submissions." (AR Tab 20c 3106.) Additionally, the Corps informed offerors that it may also consider "information obtained from the [CPARS]." (*Id*. at 3114.) The Corps also retained the discretion to consider other information, including:

> [D]emonstrated record of successful performance in comparable projects; demonstrated ability to select, retain, support and, when necessary, replace subcontractors; demonstrated implementation of corrective measures that have been implemented to resolve performance issues; demonstrated record of reasonable and cooperative behavior and commitment to customer satisfaction; demonstrated record of cost and schedule management; and the degree of relevancy of all of the considered efforts.

(*Id*.)

The SSEB noted that all five of Tetra Tech's projects "involv[e] essentially the same scope and magnitude of effort and complexities this solicitation requires." (AR Tab 50 at 5283.) After further noting that Tetra Tech's ratings were all satisfactory or marginal, the SSEB

documented that "these ratings were verified by review of the comments to each CPARS/PPQ report." (*Id.*) The SSA also noted that "one Tetra Tech project reported some risk in site safety/security." (AR Tab 52 at 5334.)

The record shows "[t]he ratings and *information* for each project CPARS/PPQs in the system were reviewed." (AR Tab 62b at 5981) (emphasis added.) Further, Tetra Tech's "ratings were verified by review of the comments to each CPARS/PPQ report." (AR Tab 50 at 5283.) Tetra Tech's claim that the Corps did not look beyond the adjectival ratings in evaluating its past performance is belied by the record. *See Tellus Strategies, LLC v. United States*, 182 Fed. Cl. 92, 135 (2026). All the CPARS ratings had narrative reports associated with them. Only the two PPQs on which Tetra Tech was assigned marginal ratings lacked any explanation. When a narrative does not exist, an agency cannot rely on it.

Additionally, when agency evaluators note that a CPARS rating or PPQ does not have a supporting narrative, they do not need to track down the rating official to construct a rationale for a rating after the fact. It is unreasonable to expect evaluators to find supporting evidence for a rating when none exists. The relevant inquiry is whether the agency reasonably evaluated the available information regarding past performance information, consistent with the solicitation, and adequately supported its conclusion, not whether the agency went out and sought supporting evidence for every CPARS rating or PPQ an offeror received when the originating agency did not provide it at the time of the rating.

Here, 36 of the 38 ratings had supporting narratives that the Corps reviewed. (AR Tab 50 at 5283.) The SSEB acknowledged that the two marginal PPQs lacked a descriptive or explanatory narrative. (*Id.*) The SSEB's approach to evaluating Tetra Tech's past performance, given this limitation for the two PPQs, was both reasonable and consistent with the solicitation.

**3. Evaluation of Pond's Past Performance**

The solicitation provided clear instructions and a common rubric for evaluating past performance. (AR Tab 20c at 3106-07, 3113-15.) Offerors were to submit interim CPARS ratings and PPQs for between two and five past projects. These projects would "be reviewed first for recency," and "[p]rojects that are not recent, will not be considered in the evaluation." (*Id.* at 3113.) Recent projects would be "reviewed to determine the relevancy of the past performance information," and "[m]ore relevant past performance will be treated as a stronger predictor of future success and will therefore have more influence on the overall performance confidence assessment than past performance of lesser relevance." (*Id.*) Relevancy would be assessed on a sliding scale with possible scores of not relevant, somewhat relevant, relevant, and very relevant. (*Id.*) Finally, "the projects will be reviewed for [ ] quality," which was "defined as the overall quality of the past performance." (*Id.*) The SSEB would then assign a "confidence assessment" on a sliding scale of no confidence, limited confidence, neutral confidence, satisfactory confidence, and substantial confidence.

Pond submitted three references: a project performed from July 29, 2025, through October 29, 2025 (Project 1); a project performed from July 7, 2024, through July 6, 2025 (Project 2); and a project performed from June 2, 2024, through June 1, 2025 (Project 3). (AR

Tab 22c at 3261, 3272, 3278.) While most of Pond's ratings on Project 1 were exceptional (one was very good), Pond's ratings on its other two projects were mostly satisfactory.

Tetra Tech argues that the SSEB should have considered the variation in Pond's past performance. The solicitation does not indicate that the Corps will take such variation into account when determining the quality of past performance. Instead, the solicitation defines "quality" as "the overall quality of the past performance." (AR Tab 20c at 3113.) The SSEB complied with this definition. It found that Pond's "CPARS rating ranged from [s]atisfactory to [e]xceptional" and verified these ratings by reviewing "the comments to each CPARS report." (AR Tab 50 at 5280.) The SSEB then concluded that the comments "fully support the respective adjectival CPARS ratings." (*Id.*)

Tetra Tech also argues that the SSEB did not properly account for the quantity of Pond's references and the variance in their relevance when evaluating Pond's past performance. Pond submitted only three past performance references, and one of those references was deemed only "relevant," not "very relevant." In essence, Tetra Tech argues that because it submitted five very relevant past performance references, whereas Pond submitted two very relevant references and one relevant reference, the Corps could not rate Pond's past performance as better than Tetra Tech's. The solicitation does not, however, specify that the number of references is an evaluation factor. Instead, it only specifies that offerors shall submit "a minimum of two projects and a maximum of five completed projects." (AR 20c at 3106.)

Pond had two very relevant projects and one project that was only relevant; the CPARS ratings for all three of Pond's projects ranged from satisfactory to exceptional. Tetra Tech had five very relevant projects, but its CPARS ratings were merely satisfactory or marginal. Thus, after combining the relevancy and quality of the projects and applying the criteria of the solicitation, it was a reasonable exercise of the Corps' discretion and consistent with the solicitation to assign Pond a rating of "substantial confidence" for its past performance.

**C. Tetra Tech's Small Business Participation**

Tetra Tech argues that the Corps' evaluation of its small business participation was flawed. The Corps was to evaluate offerors on two bases: (1) "level of small business commitment demonstrated for the proposed acquisition," and (2) "the use of small businesses demonstrated in the performance of prior contracts relevant to the PWS." (AR Tab 20c at 3107.) According to Tetra Tech, the solicitation did not require offerors to exceed each MQR target to receive an outstanding rating. The Corps assigned Tetra Tech's small business participation four strengths—one for each of the three MQRs it proposed to exceed, and one for its [* * *] commitment letters—and no weaknesses, deficiencies, or uncertainties. (AR Tab 36d at 5084–85.) The Corps ultimately gave Tetra Tech a rating of good, finding that its proposal reflects a "thorough approach and understanding of the small business objectives," as opposed to an "[o]utstanding rating" warranted by an "exceptional" approach. (AR 20c at 3115; AR 50 at 5299.)

Tetra Tech first contends that the Corps employed unstated evaluation criteria when it awarded strengths based on each MQR an offeror exceeded and an additional strength for providing letters of commitment. Next, Tetra Tech argues that the Corps failed to consider Tetra

Tech's use of small businesses to perform prior relevant contracts. The Corps' evaluations focused exclusively on the MQR percentages and letters of commitment. According to Tetra Tech, because the evaluations make no mention of small business performance in past relevant contracts, the Corps failed to consider one of the stated evaluation factors.

To demonstrate an agency committed error by evaluating offers in a way not enumerated in the solicitation, a protestor must show the agency "used a significantly different basis in evaluating the proposals than was disclosed." *Wellpoint Mil. Care Corp. v. United States*, 144 Fed. Cl. 392, 404 (2019), *aff'd*, 953 F.3d 1373 (Fed. Cir. 2020). Even so, "an agency does not need to enumerate every detail of its consideration." *Sterling Med. Assocs., Inc. v. United States*, 177 Fed. Cl. 550, 567 (2025). "So long as the agency remains within the bounds of its solicitation, the challenged action will survive." *Id.*

On small business participation, the solicitation explained that "[a]ll offerors . . . will be evaluated on the level of small business commitment demonstrated." (AR Tab 20c at 3107.) The solicitation added that "[t]he small business participation commitments for this procurement" were listed in the solicitation. (*Id.*) The solicitation itself set forth minimum small business participation targets for various types of small businesses. (*Id.* at 3108.)

Tetra Tech argues that because the solicitation did not define what "the level of small business commitment demonstrated for the proposed acquisition" entailed, the Corps was precluded from awarding strengths for exceeding the defined MQRs. During the post-award debriefing, Tetra Tech inquired into what "specific aspects of the proposal prevented [the Corps] from determining that [Tetra Tech's] approach was 'exceptional' and assigning an [o]utstanding rating?" (AR Tab 62b at 5981.) The Corps responded:

> Tetra Tech received 4 strengths out of a potential 7, and exceeded some but not all of the Small Business Participation objectives which resulted in the rating assigned. Based upon the strengths received, Tetra Tech did not achieve the level of an [o]utstanding rating.

(*Id.*)

The Corps did not identify the seven potential strengths that offerors could be assigned for small business participation, either in instructions to prospective offerors before proposals were due or in response to Tetra Tech's debriefing inquiry. (*See* AR Tabs 20c & 62b.)

The solicitation, however, established the minimum requirements to achieve a rating of acceptable with respect to each MQR. (AR Tab 20c at 3107-08.) The solicitation likewise notified offerors that the Corps could assign strengths for "an aspect of an offeror's proposal [that] will exceed specified performance or capability requirements to the advantage of the Government during contract performance." (*Id.* at 3110.) Thus, the solicitation identified all the MQRs that were to be evaluated. The Corps then determined that exceeding each MQR was to the advantage of the government and awarded strengths accordingly. (*Id.*) The Corps' evaluation of this factor was reasonable and within the bounds of its discretion under the solicitation when it compared Tetra Tech's small business participation targets to the various targets for each small business subcategory specified in the solicitation.

Tetra Tech's second argument, that the Corps did not evaluate small business participation in past contracts, is equally unpersuasive. The solicitation provided that the Corps would "evaluate the level of the [o]fferor's commitment to [s]mall [b]usiness demonstrated in the proposed acquisition and the use of [s]mall [b]usinesses in the performance of prior contracts relevant to the PWS." (Tab 20c at 3115.) The solicitation neither elaborated further nor explained the criteria the Corps would use to evaluate the proposals. In documenting the evaluations on small business participation, the SSEB specified for each offeror that "[e]valuation criteria not specifically addressed as a strength, weakness, deficiency, or uncertainty were determined to be met." (AR Tab 50 at 5294, 5297, 5299, 5302, 5305.) Thus, the record reflects not, as Tetra Tech argues, that the Corps ignored an element in evaluating proposals, but that all offerors met this requirement, without earning a distinctive strength, weakness, deficiency, or uncertainty. Tetra Tech's argument fails.

Tetra Tech also fails to show how consideration of the information submitted in its past performance references regarding its use of small business on previous contracts would have improved its rating under the small business participation factor. The past performance information Tetra Tech argues the Corps failed to consider does not support its argument that consideration of the information would have resulted in a higher rating for small business participation. (AR Tab 24c at 3713, 3719, 3729, & 3737–38.) The information reflects that on one project, Tetra Tech failed to meet the goals for using Veteran-Owned and HUBZone small businesses. (*Id*. at 3713.) For its second past performance project, Tetra Tech did not achieve its goal for Service-Disabled Veteran-Owned small businesses. (*Id*. at 3719.) For its fourth past performance project, Tetra Tech again failed to meet its goal for Service-Disabled Veteran-Owned small businesses. (*Id*. at 3737-38.) Tetra Tech's past failures to meet all the small business goals in its subcontracting on its past performance projects would not have necessarily merited more favorable, rather than unfavorable, treatment in the Corps' evaluation.

**D. Price Evaluation**

The Corps evaluated price for fairness and reasonableness. (AR Tab 20c at 3115.)To determine whether an offeror's price was fair and reasonable, the Corps established four charts: one for each CLIN and overall price, one for labor rates of key personnel, one for CM service order markups, and one applying the labor rates and service order markups to the sample service order forms. (AR Tab 50 at 5311-13.)

After listing each offeror's proposed pricing in each of the four charts, the average price for each category and sub-category and the standard deviation were calculated. (*Id*. at 5310.) The Corps then calculated one standard deviation above and one standard deviation below the average to create a range of reasonableness for proposed pricing. Prices that fell outside this range were considered "outliers," and colored yellow if more than one standard deviation below the average or red if more than one standard deviation above the average. (*Id*. at 5310-11.)

Four offerors—Pond, Tetra Tech, VGS, and Offeror E—included all the required pricing information with their proposals. Offeror D included most of the information required for the Corps' pricing analysis but failed to submit markup percentages for CM or the sample service orders. (*See* Tab 23k.1.) Rather than remove Offeror D from the pricing analysis, the Corps

inserted values of "0.00" for Offeror D's markups and sample service orders in the chart and considered these zero values in calculating average prices. (AR Tab 50 at 5312-13.)

Tetra Tech and VGS both argue that, under RFO 15.404-6, the Corps had to conduct a review for unbalanced pricing, and the record lacks any such analysis.[4] VGS expands on this argument, contending that the inclusion of Offeror D's pricing data in calculating the standard deviations was irrational, and, had that pricing data been removed, it would have been apparent to the Corps that Pond's pricing was unbalanced and required an unbalanced-pricing analysis.

Tetra Tech argues that the recurring and non-recurring elements of each offeror's proposal are inherently vulnerable to unbalanced pricing. Tetra Tech argues that because "[t]his procurement included submission of separately priced items, so [the Corps] was required to conduct an unbalanced pricing analysis and [provide] subsequent determinations based on the results of that analysis." (ECF 42 at 41.) According to Tetra Tech, the SSEB did not explain in its pricing analysis that it had looked at the offerors' pricing for balance and did not explain that it found no unbalanced pricing. Thus, the requirement to conduct an unbalanced pricing analysis was not met. Because the Corps did not conduct this analysis, its evaluation of Pond's price and resulting award must be set aside. (*Id.*) Tetra Tech argues that the Corps should have found performance risk from the fact that Pond's total service order fee was [* * *] percentage points higher than the next closest offer and an outlier. Positing Pond's higher fee as a performance risk, Tetra Tech argues that Pond's proposal was unbalanced and required the Corps to perform an unbalanced pricing analysis. [5] (*Id.*)

---

[4] RFO 15.404-6(b), applicable to this procurement, provides:

> (1) All offers with separately priced line items or subline items must be analyzed to determine if the prices are unbalanced. If cost or price analysis techniques indicate that an offer is unbalanced, contracting officers must—
>
>> (i) Consider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection decision; and
>>
>> (ii) Consider whether award of the contract will result in paying unreasonably high prices for contract performance.
>
> (2) An offer may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government.

[5] In its reply brief, Tetra Tech also challenges the price-analysis methodology used by the Corps. It argues that the use of standard deviations was inappropriate given the small sample size. This argument was not presented in its opening brief. Arguments not raised in a party's opening brief are forfeited. *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002). Even if the argument were not forfeited, "'[t]he depth of an agency's price analysis is a matter within the sound exercise of the agency's discretion and [the court] will not disturb such an analysis unless it lacks a reasonable basis.'" *Worldwide Language Res., LLC. v. United States*, 127 Fed. Cl. 125,

VGS argues that the pricing proposed by Offeror D, whose offer was deemed unawardable in the technical evaluation, should have been removed from the calculation of the standard deviation. (ECF 40 at 11.) According to VGS, the inclusion of Offeror D's pricing "improperly skewed the average and standard deviation calculations used by the Corps to evaluate price fairness, reasonableness, value, and balance, and led the Agency to distorted and defective conclusions about Pond's price proposal. . . ." (*Id*. at 12.) VGS contends that had Offeror D's proposed pricing been removed from the calculation of the standard deviation for the service order markup fee, that standard deviation would have changed from 7.05 percent to 1.29 percent, and Pond's total service order fee would have been flagged as more than one standard deviation above the average. (*Id*. at 13.)

VGS also argues that Offeror D's proposed pricing should not have been included when evaluating each CLIN and the overall price. Had that information not been included in the total price chart, the standard deviation for overall total price would have shifted from $4,322,468.72 to $1,271,546.22, and the Corps would have found that VGS's overall price, based on its PM work, was more than one standard deviation below the average. (*Id*. at 13-14.)

According to VGS, had the Corps properly calculated the standard deviations, it would have found that Pond understated the cost of its PM work but proposed a higher charge for the service order markup for CM work. Given the Corps' limited funds, a higher service order markup would lead to less work being done over the life of the contract. Thus, VGS argues that the service order markup fee directly affects the value of performance, and the Corps had to conduct an analysis of the unbalanced pricing. Had it done so, "the [Corps] would have found Pond's pricing to be unbalanced—and would have found material risk in Pond's facially lower-priced proposal as a result of its unbalanced pricing and unreasonably high [service order] [f]ee." (*Id*. at 18.)

VGS then argues that the failure to perform the analysis affected the best value analysis:

> Had the Agency rationally evaluated proposals in accordance with the stated criteria and RFO 15.404—including by omitting incomplete proposals from the average and standard deviation calculations relied upon for the price analysis, and rationally evaluating the balance and value presented by Pond's proposal—the Agency would have concluded that [VGS]'s fair, reasonable, and balanced price presented a better

---

134 (2016) (quoting *Biospherics, Inc. v. United States*, 48 Fed. Cl. 1, 10 (2000) (citation omitted)). Tetra Tech argues that the "Administrative Record is [missing] any explanation as to why an offeror's pricing being within one standard deviation from the average suffices to determine that such pricing is balanced." (ECF 46 at 30.) This argument is backwards. It is Tetra Tech's burden to show that the agency's choice of price analysis lacks a reasonable basis, not the Corps' burden to defend its choice. Tetra Tech has not made such a showing. Indeed, the same methodology has been upheld when used with an even smaller sample size. *See XPO Logistics Worldwide Gov't Servs., LLC v. United States*, 133 Fed. Cl. 162, 182 (2017), *aff'd*, 713 F. App'x 1009 (Fed. Cir. 2018). VGS disclaims any challenge to the Corps' methodology for its price analysis, disputing only the application of that methodology. (ECF 40 at 11 n. 3.)

value to the Agency, notwithstanding that its price was facially higher than Pond's for the PM work comprising a very small portion of the requirement.

(*Id*. at 20.)

**1. Absence of an Unbalanced Pricing Explanation in the Pricing Analysis**

"All offers with separately priced line items or subline items must be analyzed to determine if the prices are unbalanced." RFO 15.404-6(b). "Unbalanced pricing may increase performance risk and could result in payment of unreasonably high prices." RFO 15.404-6(a)(1). "Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more line items is significantly over or understated as indicated by the application of cost or price analysis techniques." *Id*. Thus, there are two steps to an unbalanced-pricing analysis: (1) identifying the existence of unbalanced pricing through the application of cost or price analysis techniques; and (2) when unbalanced pricing is found to exist, an evaluation of the risk to performance or to the agency incurring unreasonably high prices. *IAP World Servs., Inc. v. United States*, 153 Fed. Cl. 564, 571 (2021).

Allowable price analysis techniques include "[c]omparison of proposed prices received in response to the RFP," and "[c]omparison of proposed prices with independent Government cost estimates." RFO 15.404-1(b)(1), (5); *see also* RFO 15.404-1(c) (noting that comparing proposed prices received in response to a solicitation is one of two "preferred techniques"). Thus, "the FAR does not require that the agency set out a separate analysis specifically for unbalanced pricing and instead permits an agency to rely on cost or price analysis techniques." *Survival Sys., USA, Inc. v. United States*, 102 Fed. Cl. 255, 271 (2011).

An agency need not evaluate performance risk and unreasonably high prices "preemptively" during its cost or price analysis. *IAP World Servs.*, 153 Fed. Cl. at 571. If an agency does not identify unbalanced pricing through its cost or price analysis techniques, "the second step of the unbalanced pricing analysis [is] not trigger[ed] because no unbalanced pricing was identified, meaning that there [is] no basis for the [agency] to conduct [a] risk analys[i]s." *Id*. at 572. Unless the solicitation otherwise requires it, the FAR does not "require[] the [agency] to discuss each individual CLIN and explain why it concluded that any particular price differentials between offerors' proposals as to that CLIN did not evince material unbalancing." *Munilla Constr. Mgmt., LLC v. United States*, 130 Fed. Cl. 635, 652 (2017). The solicitation did not impose that obligation here.

The Corps did not need to move on to the second step of the unbalanced-pricing analysis, because the Corps reviewed each offerors' prices through the application of the solicitation's price analysis techniques and did not find any offerors' prices to be unbalanced.

Although it does not contain anything labeled an "unbalanced pricing analysis," the record establishes that the Corps took steps to identify unbalanced pricing by considering each offeror's proposed pricing on a CLIN-by-CLIN and labor-category-by-labor-category basis, as well as on a total-evaluated-price basis. In conducting the analysis, the Corps identified high or low outlying prices and any areas of concern through the standard deviations it calculated. (AR Tab 50 at 5310-5316.) The SSEB noted that because each offeror's overall total price is within

10 percent of the average total price, "the standard deviation of +/-1 is a very small difference in average." (*Id*. at 5311.) Given the narrow range in pricing among offerors, even "[p]ricing identified as outside the standard deviation parameters may be acceptable." (*Id*.) Through this process, the Corps determined that none of the CLINs or labor categories stood out as significantly understated or overstated.

Given this conclusion, it was within the Corps' discretion to determine no further unbalanced pricing analysis was required. *See Worldwide Language Res.,* 127 Fed. Cl. 125, 134 (2016); *see also CCL Serv. Corp. v. United States*, 48 Fed. Cl. 113, 122 (2000). There can be no unacceptable risk from unbalanced pricing if prices are not unbalanced in the first place, and when they are not, an agency need not move on to conduct the second step of the unbalanced pricing analysis. *IAP World Servs.*, 153 Fed. Cl. at 572. The plaintiffs' challenge to the pricing analysis and the failure of the Corps to conduct an unbalanced-pricing analysis is rejected.

**2. VGS's Challenge to the Use of Offeror D's Data**

The only remaining issue is VGS's challenge to the use of Offeror D's data in calculating averages and standard deviations. Offeror D failed to provide service order markup rates; this failure rendered its pricing data incomplete. The Corps therefore disqualified Offeror D's proposal. VGS argues the Corps should also have removed Offeror D's pricing information from the pricing analysis for the CLINs and the total price, as well as the service order markup rates, because of Offeror D's failure to provide complete data for some inputs, and because the prices Offeror D did provide were significantly higher than those provided by other offerors. Instead of not using any of Offeror D's pricing information, the Corps included Offeror D's pricing, when it existed, in calculating average pricing and standard deviations. The Corps also inserted a value of zero in calculating the average service order markup rates and the standard deviation for service order pricing.

VGS challenges the use of the partial pricing information from Offeror D and argues the substitution of zero values when Offeror D did not provide a proposed price distorted the Corps' calculations. Had Offeror D's information not been included, VGS argues, several of Pond's proposed prices would have fallen outside one standard deviation of the average, and that outcome would have required an unbalanced-pricing analysis. VGS argues that any reliance on calculations built on incomplete information, or, worse, the use of zero values in place of non-existent information, was arbitrary and capricious and prejudicial.

VGS's argument presents two distinct issues. First, was it arbitrary to include Offeror D's pricing information, when available, in calculating average pricing among offerors? Second, was the use of zero values in calculating average percentages and standard deviation for the service order markup rates, for which Offeror D failed to provide any proposed rates, rational?

**a. Inclusion of Offeror D's Pricing Information**

Agencies enjoy considerable discretion in determining the appropriate methodology for evaluating proposed prices. *See DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1310 (Fed. Cir. 2021). This discretion extends to an agency's determination to include all the proposed pricing information, including high pricing provided by a technically unacceptable offeror, in its

application of analytical tools to assess proposed prices. *See Trilogy Fed., LLC v. United States*, 159 Fed. Cl. 98, 111-12 (2022) (use of prices from "technically unacceptable" offerors for comparing offers' pricing was reasonable).

The agency is in the best position to determine what data points to include in its analysis. The judicial role is not to determine whether the inclusion or exclusion of certain data might have produced a more favorable result for a particular offeror, but to resolve only whether the methodology employed by the agency was rational and consistent with the solicitation's requirements and treated all offerors alike. The mere fact that an alternative calculation would have identified additional pricing concerns does not, without more, establish that the agency's chosen approach was irrational. *IAP World Services, Inc.*, 153 Fed. Cl. at 567 ("[T]he [c]ourt's role here is not to test whether there is a better, faster, or otherwise more correct way to analyze unbalanced pricing; rather, it is the [c]ourt's task to determine whether the [agencies] unbalanced pricing analysis is reasonable.").

Agencies may reasonably decide to include more data, even if those data are aberrational, in conducting a price analysis. The inclusion of such data may be especially useful when there are only a few offers from which to determine reasonable pricing. *See Matter of: Guidehouse LLP*, B-419336, 2021 WL 674174, at *9-10 (Comp. Gen. Jan. 21, 2021). Agencies are also free to drop entirely any outlying or aberrational pricing information among offers if they explain the basis for doing so, and that basis is consistent with the solicitation. If the agency proceeds in a manner applied consistently to all offers and explains its rationale, which is not in conflict with the solicitation, the judicial role is at an end.

VGS has not established that the Corps acted unreasonably by retaining the pricing information that Offeror D did submit when it calculated average prices and standard deviations for those elements for which Offeror D submitted prices. Although Offeror D failed to provide the required service order markup rates, it did supply pricing information for each CLIN and a total evaluated price. Thus, the gaps in its pricing data did not render its entire price proposal devoid of information that the Corps could reasonably conclude was appropriate to consider, as it was useful for comparative purposes.

VGS does not explain why the use of Offeror D's partial information was in and of itself unreasonable for the purpose of comparing pricing among the remaining offers. The more information an agency has, the better its price comparison is likely to be. When the pool of available pricing information is relatively small, the exclusion of an offeror's otherwise usable pricing information may materially affect the resulting statistical comparisons. Indeed, the limited number of offerors participating in the procurement further supports the reasonableness of including Offeror D's proposed pricing in calculating average proposed pricing and standard deviations to compare the remaining offers. Excluding the data entirely would have reduced the number of prices available to calculate the average prices and the corresponding standard deviations. While the Corps may reasonably have chosen to exclude all of Offeror D's pricing information because its proposal lacked the service order markup rates, VGS has not shown that it was unreasonable for the Corps to include the pricing data Offeror D did provide. VGS's first challenge to the Corps' pricing analysis fails.

**b. The Input of Zero Values Where Offeror D Provided No Value**

As to its second pricing claim, VGS argues that the Corps' decision to input zero values in those instances when Offeror D failed to provide proposed prices was irrational. In response, the defendant and defendant-intervenor argue that the zero values were only used for calculating average service order markup fees and the related standard deviation. These fees were neither a line item nor a subline item of the contract, so, the defendants assert, the zero values were inconsequential to the Corps' review of the offerors' pricing.

An unbalanced pricing analysis is an evaluation of all "separately priced line items or subline items . . . to determine if the prices are unbalanced." RFO 15.404-6(b)(1). The regulation addresses the relationship between the prices assigned to separately priced contractual items and the risks that arise when those prices are materially disproportionate. It does not independently require an agency to subject every pricing input, supporting calculation, or analytical tool used during its price evaluation to a separate unbalanced pricing analysis. *See Newimar S.A. v. United States*, 160 Fed. Cl. 97, 140 (2022), *aff'd*, 2023 WL 8534614 (Fed. Cir. Dec. 11, 2023); *Logistics Health, Inc. v. United States*, 154 Fed. Cl. 51, 86 (2021).

The RFO defines "line item" as a "basic structural element in a procurement instrument that describes and organizes the required product or service for pricing, delivery, inspection, acceptance, invoicing, and payment." RFO 2.101. This definition is not limited to contract line items. When an element of a procurement is binding and directly affects the total price of a contract, it is part of a line item for unbalanced pricing purposes. *See MVL USA, Inc., v. United States*, ___ Fed. Cl. ___, No. 25-1664, 2026 WL 3119251, at *11 (Fed. Cl. Sep. 28, 2026) (holding that binding labor categories and rates affect the pricing of services and, therefore, represent sub-CLINs). Thus, the scope of the agency's obligation to determine whether unbalanced pricing exists and, if it does, to conduct the requisite analysis must be evaluated by reference to the solicitation's pricing structure and the items for which offerors had to submit separate prices.

Here, the sample service order markup rates were not separately priced CLINs or sub-CLINs, as the service orders fell under CLIN 0004, for which the government supplied a predetermined plug number and expressly instructed offerors not to propose their own line-item pricing. (AR Tab 20d.) The fact that the Corps provided a predetermined plug number for CM makes the sample service order markup rates especially important, however, as they were the Corps' primary indicator for how much CM would cost during contract performance, which represents the substantial majority of the costs under the contract. Further, the service order markup rates were binding on the offerors and would become "the maximum allowable rates on the awarded contract." (AR Tab 20c at 3109; AR Tab 20d.) These rates, when combined with the labor rates, also provided in the pricing worksheet, total the actual price each CM request would cost. Thus, the figure was not merely informational or an ancillary component of the proposal; it established a discrete, enforceable pricing obligation that formed an integral part of the offeror's overall pricing structure. The figure thus functioned effectively as a sub-CLIN, notwithstanding the absence of an express designation to that effect. The defendants' argument minimizing the effect of any error is thus rejected.

Because the sample service order markup rates functioned as a sub-CLIN and were relevant to determining whether an offeror's proposed pricing was unbalanced, the Corps had to provide a rational basis for entering zero values for Offeror D's non-existent pricing when calculating average pricing and the standard deviation for CLIN 0004. The extent to which the Corps expressed its rationale in considering Offeror D's missing pricing for this CLIN by treating it as zero is found in its pricing analysis. There, the Corps noted: "[Offeror D] provided no markup information, therefore, no evaluation could be made." (AR Tab 50 at 5315.) Stating the obvious truth that no evaluation could be made when no data is provided does not explain why the Corps then took the additional step of inputting zero values in place of the missing data. The record lacks any such explanation.

The Corps' decision to include zero values in its standard deviation analysis was irrational because those values did not meaningfully reflect the range of percentages offered for the service order markup fee. By incorporating zeros into its calculations without accounting for their significance, the Corps distorted both the average price of the remaining offers and the resulting standard deviation. The distorted average pricing undermined the reliability of its statistical analysis.

The extent of the distortion is significant. Using the Corps' chart, the average total service order fee percentage is lower than the pricing proposed by each of the four remaining offers. (*Id.* at 5312-13.) Removing the zeros increases the average percentage for profit by 1.73 percent, the average service order indirect fee by 1.39 percent, and the average total service order fee by 3.12 percent. Similarly, the standard deviation for profit decreased by 2.62 percent, for service order indirect fee by 1.73 percent, and for total service order fee by 5.76 percent. The inclusion of zero values that did not reflect actual proposed pricing artificially altered the averages and standard deviations and obscured differences among the offerors' proposed prices. Standard deviation is intended to measure the dispersion of values around a representative mean, but the inclusion of artificial zero values distorted that mean. Thus, the inclusion of zero values in the Corps' calculations was irrational.

While the Corps' decision to include zero values was irrational, VGS fails to show that it was prejudiced by the error. VGS argues that had the calculations not included the zero values, the Corps would have observed that Pond's total service order fee was more than one standard deviation above the average and identified its pricing as unbalanced. The Corps would have then had to conduct an unbalanced-pricing analysis. VGS argues that, as a result, the best value determination would have concluded that VGS's fair, reasonable, and balanced pricing presented a better value to the Corps than Pond's proposal, notwithstanding its higher pricing.

"The requirement to determine whether an agency's error was prejudicial to the plaintiff 'is always required before setting aside a bid award, regardless of whether the error identified at the first step was arbitrary and capricious action or, instead, a violation of law.'" *Superior Waste Mgmt. LLC v. United States,* 169 Fed. Cl. 239, 275 (2024) (quoting *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 996-97 (Fed. Cir. 2021). "'To establish prejudicial error,' a party must show that 'but for the error, it would have had a substantial chance of securing the contract.'" *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1291 (Fed. Cir. 2020) (quoting *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009)), *cert. denied*, 142 S. Ct. 68 (2021). "Put another way, to show prejudice a disappointed bidder needs to show

that 'it had greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest.'" *REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024) (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). VGS has the burden to establish prejudice. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."). "[T]here is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision." *Sys. Stud. & Simulation, Inc.*, 22 F.4th at 998.

VGS has failed to show it was prejudiced. Although VGS has shown that the inclusion of Offeror D's zero values in computing average pricing and the related standard deviation for the sample service order forms was irrational, it has not shown that the changes in the average pricing and standard deviation after removing the zero values reveal Pond's pricing is unbalanced. The SSEB noted that because there were only five offerors and each offeror's total price was within approximately 10 percent of the average price, "the standard deviation of +/- 1 is a small difference in average." (AR Tab 50 at 5311.) Thus, "[p]ricing identified as outside the standard deviation parameters may be acceptable." (*Id.*) Indeed, with so few offerors, a standard deviation model did not need to be used to determine whether prices were reasonable or balanced. The Corps could have simply looked at the prices, labor rates, and service order markup percentages side-by-side to determine whether pricing or markup percentage was unbalanced.

VGS argues that when zero values are included, as in the following chart prepared by the Corps, Pond's markup rates are not flagged as being outside the standard deviation:

| CLIN 4 MARKUP | POND | Offeror D | TETRA TECH | VGS | Offeror E | *Average* | Standard Deviation | Standard Deviation | Standard Deviation |
|---|---|---|---|---|---|---|---|---|---|
| PROFIT | [* * *] | 0.00% | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] |
| SO INDIRECT | [* * *] | 0.00% | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] |
| TOTAL SO FEE | [* * *] | 0.00% | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] |
| EMERGENCY FEE | [* * *] | $0.00 | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] |

(AR Tab 50 at 5312-13 (yellow highlighting for pricing below the standard deviation).)

If Offeror D is removed from the average and standard deviation calculation, Pond's total service order fee is flagged as more than one standard deviation from the average, as observed in the following chart prepared by VGS:

| CLIN 4 MARKUP | POND | TETRA TECH | VGS | Offeror E | *Average* | Standard Deviation | Standard Deviation | Standard Deviation |
|---|---|---|---|---|---|---|---|---|
| PROFIT | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] |
| SO INDIRECT | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] |
| TOTAL SO FEE | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] |
| EMERGENCY FEE | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] | [* * *] |

(ECF 40 at 13 (yellow highlighting as in the above chart; red highlighting for pricing more than the standard deviation).)

Pond's combined proposed profit and indirect service order costs are outside the standard deviation. VGS argues this new fact requires an unbalanced-pricing analysis, which the Corps failed to conduct because Pond's pricing was not seen as too high when the zero values were included.

The high percentage outside the standard deviation reflects the combination of Pond's proposed profit and indirect costs, but neither category is itself unreasonably high or reflects on its face unbalanced pricing. Pond's proposed profit of [* * *] percent is [* * *] as Tetra Tech's proposed profit; Pond's indirect service order costs is [* * *] percent, only [* * *] percent higher than VGS's indirect service order costs. Both Pond's profit and indirect costs are identical or close to the proposed pricing or at least one of the other offerors. On that basis alone, Pond's combined profit and indirect cost proposals are not unreasonably high, even though their combined value is [* * *] percent above the standard deviation after removing the zero values inserted for Offeror D.

VGS's own calculations demonstrate that Pond's combined pricing is barely outside the standard deviation. The Corps did not have to use standard deviations to determine unbalanced pricing, and it acknowledged how close all offerors were in pricing. Using the correct means of calculating average price and the standard deviation for service orders leads to finding that Pond's service order pricing barely exceeds the standard deviation. VGS has not met its burden of showing what risks the Corps faces from this minor discrepancy. Indeed, as this court has previously recognized, "there is little risk from unbalanced pricing in firm fixed price contracts," like this one. *Ekagra Partners, LLC v. United States*, 163 Fed. Cl. 189, 215 (2022) (citing *Munilla Constr. Mgmt.*, 130 Fed. Cl. at 652).

A [* * *] percent difference in pricing on one aspect of the procurement is not enough on this record to prove the existence of prejudice.

In any event, the Corps did address the issue indirectly, even in the absence of noting the small degree by which Pond's pricing was too high. The SSEB explained that the fact that an offer's CLIN price, labor rate, or markup percentage is + or – 1 outside the standard deviation does not equate to a price being unreasonably high or low because there were so few offers with only small variances in pricing. (AR Tab 50 at 5311.) Although Pond's total service order

markup is above one standard deviation from the average after removing the zero values, both protestors have multiple line items also flagged by the standard deviation model.

VGS has failed to show that Pond's service order markup percentage is unreasonably high or that the Corps would have identified it as such had the Corps not included values of zero for Offeror D's proposal in the relevant calculation of the standard deviation chart. VGS has also failed to demonstrate any meaningful risk to the agency from the minor degree by which Pond's pricing did exceed the standard deviation. Thus, VGS has failed to show prejudice from the Corps' error in including the zero values in making its calculations and cannot prevail on this claim.

**E. Best Value Determination**

The plaintiffs argue that based on the flaws they identified in the Corps' evaluations, the best value determination is arbitrary and capricious. According to the plaintiffs, when an agency undertakes a best value award and the ratings contributing to the agency's tradeoff analysis are flawed, the best value award itself is arbitrary and capricious. *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 695 (2012).

"An agency's contract award is [ ] least vulnerable to challenge when based upon a best value determination." *PlanetSpace Inc. v. United States*, 96 Fed. Cl. 119, 125 (2010) (citing *Galen Med. Assocs.* 369 F.3d at 1330); *see also E.W. Bliss Co.*, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."). Moreover, "[i]t is well settled that the government is only required to make a 'cost/technical tradeoff . . . where one proposal is rated higher technically than another, but the other is lower in cost.'" *Sirius Fed., LLC v. United States*, 153 Fed. Cl. 410, 424 (2021) (quoting *Indus. Prop. Mgmt., Inc. v. United States*, 59 Fed. Cl. 318, 324 (2004)).

Here, Pond's proposal received the highest technical rating and offered the lowest evaluated price. (AR Tab 52 at 5333-35.) The SSA did not merely rely on the adjectival ratings but documented her consideration of the relative strengths and merits of the proposals. She ultimately "determined that there are no features or enhancements in the competing, higher-priced proposal that would provide additional value to the Government." (*Id.* at 5334.)

To demonstrate any error in this conclusion, the plaintiffs must show that the evaluations underlying the award decision were arbitrary and capricious and/or that the price evaluation was flawed. As explained above, however, the plaintiffs have failed to undermine any of the SSEB's or SSA's conclusions on the challenged elements, including pricing, of the various proposals. They therefore cannot succeed in their challenge to the Corps' best value determination.

## VI. CONCLUSION

The Corps' evaluation of each offeror's technical and management approach, past performance, and small business participation is supported by the record and is not arbitrary and capricious. The Corps also did not treat Tetra Tech disparately. The Corps also conducted a proper price evaluation.

The defendant's and defendant-intervenor's motions for judgment on the administrative record are granted, and the plaintiffs' motions for judgment on the administrative record are denied. A separate order will be entered directing the entry of judgment.

s/ Richard A. Hertling

**Richard A. Hertling**
**Judge**